# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

X SOCIAL MEDIA LLC,

               Plaintiff,

v.

X CORP.,

               Defendant.

Case No. 6:23-CV-01903-JA-UAM

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56 AND INCORPORATED MEMO OF LAW**

On the undisputed facts, Plaintiff's trademark infringement and related claims, based solely on the parties' shared use of the letter X, fail as a matter of law.

Plaintiff X Social Media LLC is a niche advertising agency primarily serving mass tort lawyers. Defendant is a general audience social media platform. Defendant uses the letter X on different services, for different consumers, for different purposes in different channels of trade, with different advertising, and without any actionable confusion or harm in nearly two years of coexistence with Plaintiff. The material facts are undisputed, and Defendant is entitled to summary judgment.

Even if Plaintiff could establish liability for infringement—which it cannot—Plaintiff has failed to provide any evidence that Defendant has caused it harm. Instead, by Plaintiff's own admission, it offers nothing more than speculation, that fails to carry Plaintiff's burden. To the extent the Court declines to dismiss Plaintiff's claims in their entirety, the Court should dismiss Plaintiff's claim for damages.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff is an advertising agency that provides lead generation advertising services to law firms to help them recruit class action plaintiffs, primarily for mass

tort cases. Ex. 4 at 22:6, 25:23-26:1; Exs. 28, 41, 46.[1] Plaintiff creates, develops and deploys marketing campaigns including Facebook ads, external website "landing pages" and other creative concepts. Ex. 4 at 30:9-31:5, 41:23-42:7; Ex. 21 at 3; Ex. 49.

Plaintiff owns a federal trademark registration for X SOCIALMEDIA, in Class 35, for "advertising services." Ex. 34. Plaintiff's blue X SOCIALMEDIA



logo shown above, features a human holding the scales of justice, followed by the words "Social Media," evoking the legal advertising services it provides. *See* Ex. 27; Ex. 4 at 22:2-3; Ex. 8 at 18:22-19:10. Plaintiff's founder and CEO did not conduct a trademark search to determine whether any similar marks were previously registered or operating. Ex. 4 at 23:8-16, 24:4-12. Plaintiff has peacefully coexisted with nearly hundreds of other X-formative marks without challenging any of those marks. *See* Ex. 12, No. 3; Exs. 25, 31, 32, 33. Plaintiff's target customers are primarily lawyers and law firms. Ex. 4 at 80:15-19; Ex. 7 at 123:21-124:22; Ex. 8 at 11:10-11; and its competitors are businesses that provide mass tort lead generation and connections in the legal industry. Ex. 16, No. 10; Ex. 4 at 73:1-75:5; Ex. 7 at 83:23-86:9. Purchasing and engaging Plaintiff's services is a multi-step process, typically costing tens of thousands of dollars. Ex. 4 at 54:8-55:23, 83:18-84:2, Ex. 21.

Plaintiff regularly attends mass tort and other legal industry events and trade shows to promote its services; it has never seen Defendant or its competitors attend those events. Ex. 16, No. 9; Ex. 4 at 79:24-80:2, 91:10-12, 93:8-13, 94:15-17, 95:23-

---

[1] All exhibits cited herein are attached to the Declaration of Jared I. Kagan, filed contemporaneously.

25, 96:21-23. Plaintiff publishes magazines like "Mass Tort Insider," books like "A Lawyer's Guide to Mass Torts," and regularly distributes to an email list of more than 30,000 people newsletters discussing litigation updates and other topics of legal significance. Ex. 4 at 47:1-2, 49:5-51:1; Ex. 9 at 135:3-136:15; Exs. 36, 48.

Defendant provides and operates an online and app-based communications platform, formerly known as Twitter, that provides a forum for registered users to freely share news, information, photos, audio and video content. Ex. 19; Ex. 11, No. 2; Ex. 4 at 78:16-20; Ex. 6 at 58:8-14; Ex. 1 at 19:21-24. The online platform also permits registered business users to publish advertisements. Ex. 11, No. 2. Defendant has plans to expand its product offering to include end-to-end encrypted messaging and peer-to-peer payments. Ex. 1 at 102:2-18. Defendant's platform is available to everybody and anybody. Ex. 11, No. 7; Ex. 1 at 51:1-4. Defendant has attended tech-focused tradeshows and hosts private client partnership events to promote its brand. Ex. 6 at 27:22-28:18; Ex. 11, No. 8; Ex. 18. Plaintiff, in turn, does not own or operate a social networking platform under the X SOCIALMEDIA mark, Ex. 12, No. 4, and has not attended the same tradeshows. Ex. 16, No. 9.

In October 2022, Twitter was acquired by Elon Musk-owned holding companies and was later rebranded to "X" in July 2023. Ex. 11, No. 1. That rebrand occurred because of Musk's decades-long sentimental association with the letter X, dating back to a 1999 X.com business venture Musk led. *Id.*; Exs. 26, 29, 30; Ex. 1 at 18:19-25, 70:4-24. The X name often appears and is used alongside "Twitter." Ex. 20 at 7, 11; Ex. 22; Ex. 1 at 81:7-10. Defendant was not aware of Plaintiff until August

3

15, 2023, when it received a letter from Plaintiff's counsel expressing concern about Defendant's use of X. Ex. 11, No. 13; Ex. 1 at 42:3-11. Defendant has still-pending trademark applications, none of which cover "advertising services." Exs. 23, 24.

Plaintiff claims that since Defendant's rebrand, Plaintiff has received "inquiries and questions" about Defendant, largely in the form of misdirected emails and phone calls. Ex. 15, No. 5. Plaintiff's former president admitted that none of this alleged confusion resulted in actual harm to Plaintiff, and Plaintiff is unaware of any consumer that has mistakenly purchased Plaintiff's services thinking Plaintiff was associated with Defendant. Ex. 7 at 153:7-16; Ex. 12, No. 7.

Only two of Plaintiff's alleged instances of confusion purport to come from lawyers or law firms, and neither are representative of Plaintiff's typical target consumer. One came from a lawyer who does not practice in mass torts or personal injury and testified that he "would never" use the lead generation services Plaintiff provides, regardless of a connection to Defendant. Ex. 57; Ex. 2 at 7:2-3, 8:8-22, 11:23-12:8, 20: 25-21:9. The other is from Eliah McNally, an inexperienced and newly hired marketing director of a law firm, who, in his 4th month on the job, mistook Plaintiff's identity, even though his firm had a years-long relationship with Plaintiff. *See* Ex. 56; Ex. 5 at 10:17-19, 16:12-20, 18:10-15, 27:16-22, 48:10-51:6. Despite his mistake, McNally still recommended engaging Plaintiff, but his manager told him they would not use Plaintiff's services again because of previous negative experiences unrelated to Defendant. Ex. 5 at 28:19-25, 30:6-14, 34:4-12.

Plaintiff has not provided a computation of damages or submitted any expert

reports on the issue of damages. *See* Ex. 10. Plaintiff admits its theory of damages is "speculative" and is based solely on "beliefs," not on any evidence, studies, analyses, facts or data. Ex. 7 at 194:17-195:3; Ex.4 at 165:6-9, 175:3-177:19; Ex. 9 at 231:19-21. Although Plaintiff has seen declining revenue between 2023 and 2024, Ex. 35, Plaintiff's former president testified that the legal marketing industry, as a whole, suffered a decline during that time period, and that he had no evidence or any actual reason to believe that Defendant caused those losses. Ex. 7 at 192:1-194:11; *see also* Ex. 51 (noting "market fluctuations" and other threats to Plaintiff's business).

## LEGAL STANDARD

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law." *Tana v. Dantanna's*, 611 F.3d 767, 772 (11th Cir. 2010) (citing Fed. R. Civ. P. 56(c)). While the movant bears the initial burden of providing the basis and materials supporting its motion, it "simply may show. . . that there is an absence of evidence to support the nonmoving party's [burden to make its] case." *Rice–Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 840 (11th Cir.2000) (citations omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Jackson v. Sara Lee Bakery Grp.*, 517 F. App'x 645, 645-46 (11th Cir. 2011) (citations omitted). Accordingly, "summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Unleashed Mag., Inc. v. Orange Cnty.*, 6:06-CV-1690 (JA), 2008 WL 11336608, at *2 (M.D. Fla. Oct. 2, 2008) (granting defendant summary judgement on trademark infringement).

## ARGUMENT

I.    **Plaintiff's Claims (Counts I, II, IV) Fail as a Matter of Law[2]**

A federal trademark infringement plaintiff must prove that (1) it owns a valid mark entitled to protection and that (2) the defendant's mark is likely to cause confusion. *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1356 (11th Cir. 2007) (citing 15 U.S.C. § 1125(a)).[3] In assessing likelihood of confusion, courts consider seven factors: (1) strength of the mark; (2) existence and extent of actual confusion in the consuming public; (3) similarity of the marks; (4) similarity between the services offered by the marks; (5) similarity of the actual sales methods used, such as the parties sales outlets and customer base; (6) similarity of advertising methods; and (7) the alleged infringer's intent. *See Tana*, 611 F.3d at 774–75. Courts should not "mechanically apply[] these factors without regard to context," but instead focus on "whether relevant consumers are likely to believe that the . . . services offered by the parties are affiliated in some way." *Suntree Techs., Inc. v. EcoSense Int'l, Inc.*, 802 F. Supp. 2d 1273, 1281 (M.D. Fla. 2011) (JA) (granting summary judgment) *aff'd*, 693 F.3d 1338 (11th Cir. 2012). In a reverse-confusion case, as Plaintiff alleges here, the

---

[2] The Court dismissed Count III on Defendant's Motion to Dismiss (Doc. 41).
[3] *See La Dove, Inc. v. Playtex Jhirmack, Inc.*, No. 90-2794, 1991 WL 187473, at *3 (S.D. Fla. Feb. 8, 1991) ("The tests for common law trademark infringement, unfair competition of this type and violations of 15 U.S.C. § 1125(a) are essentially the same."); *see also Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investacorp) E.C.*, 931 F.2d 1519, 1521 (11th Cir. 1991).

theory is that the senior user (Plaintiff) is injured because the public assumes that it is somehow affiliated with or infringing upon the junior user (Defendant). *Curity AB v. Chenmed, LLC*, No. 22-CV-22654, 2022 WL 18956198, at *3 (S.D. Fla. Dec. 7, 2022).

Trademark infringement claims may be decided as a matter of law on summary judgement. "The likelihood-of-confusion multifactor test presupposes that various factors will point in opposing directions," and summary judgment may be appropriate even where some of the factors do not support the movant. *Tana*, 611 F.3d at 775 n.7, 782 (affirming summary judgment where two factors supported nonmovant); *Welding Servs.*, 509 F.3d at 1361 (affirming summary judgment where three factors supported nonmovant); *see also Unleashed Mag.*, 2008 WL 11336608, at *2. Reverse confusion is unlikely "if the goods or services of the parties are not competitive, the respective markets are separated and the advertising of the parties is directed at different types of purchasers." J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition ("McCarthy"), § 23:10 (5th ed.).

Plaintiff cannot meet its burden to prove that the parties' marks and services are so similar that sophisticated consumers in the legal industry are likely to be confused. And so Defendant is entitled to summary judgment.

### A.    The Likelihood of Confusion Factors Favor Defendant

#### 1.    Plaintiff's Trademark Is Thin and Defendant Has Not Commercially Overwhelmed the Relevant Market

In assessing the first factor—strength of mark—courts look at both conceptual strength (*i.e.* the mark's distinctiveness) and commercial strength (*i.e.*, real-world

consumer recognition). *See Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1258 (11th Cir. 2016) ("*FIU Bd.*"). The stronger the mark, the greater the scope of protection it is afforded; the weaker the mark, the less trademark protection it receives. *Id.* at 1256. A "strong" mark is "rarely used by parties other than the owner of the trademark," while a "weak" mark is "often used by other parties." *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 973-74 (11th Cir. 1983) (cleaned up). "[T]he extent of third-party use of a mark is an essential factor in determining a mark's strength." *See FIU Bd.*, 830 F.3d at 1257 (citations omitted).

The incontestable status[4] of a *registration* "says very little" about strength in the marketplace and can be rebutted through a showing of commercial weakness or extensive third-party use. *Sovereign Mil. Hosp. Ord. v. Fla. Priory of the Knights Hosp.*, 809 F.3d 1171, 1184 (11th Cir. 2015); *FIU Bd.*, 830 F.3d at 1257 (affirming incontestable mark as "relatively weak"); *Fla. Virtual Sch. v. K12, Inc.*, 710 F. Supp. 3d 1143, 1153-54 (M.D. Fla. 2024), (finding incontestable mark weak).For reverse confusion, courts assess the relative commercial strength of the defendant's mark. *Wreal, LLC, v. Amazon.com, Inc.*, 38 F.4th 114, 129 (11th Cir. 2022). That is because a plaintiff's claim is that "the defendant. . . has been able to commercially overwhelm the market and saturate the public conscience with its own use of the mark, thereby weakening and diminishing the value of the senior user's mark." *Id.* at 128-29.

a.    **Plaintiff's Mark is Weak**

---

[4] A trademark registration is deemed incontestable after it has been in use for 5 years following its registration. 15 U.S.C. § 1065. Incontestable status provides the owner with evidence that its mark is valid, owned by the registrant and entitled to exclusive use. 15 U.S.C. §1115(b).

Plaintiff's trademark registration for "X SOCIALMEDIA"—in Class 35 for "advertising services"—confers no rights in the letter X standing alone. *See, e.g.*, *Valencia v. Universal City Studios LLC*, No. 1:14-CV-528, 2014 WL 7240526, at *7 (N.D. Ga. Dec. 18, 2014) (trademark for "Honey Rockwell" does not confer rights in "Honey"); *Fulkerson v. The Muter Co.*, 135 U.S.P.Q. 379, at *2 (T.T.A.B. Oct. 4, 1962) (the letter "J" in JENSENS mark did not create "an identifying symbol separate and apart from the entire mark."). Thus, the entirety of Plaintiff's mark must be compared with Defendant's. *See, e.g., Colgate-Palmolive Co. v. Carter-Wallace, Inc.*, 432 F.2d 1400, 1402 (C.C.P.A. 1970) (differences between PEAK and PEAK PERIOD were "obvious" because "[i]n their entireties, they neither look nor sound alike.").

The X SOCIALMEDIA mark is symbolic of the mass tort recruitment services (*i.e.*, signing on the X) Plaintiff provides. Ex. 4 at 19:25-20:13 (explaining that "X" is the place where you sign, and "social media" describes the services). Plaintiff's mark, though incontestable, is at best suggestive of those services, and is further weakened by extensive third-party uses of X. *Unleashed Mag.*, 2008 WL 11336608, at *5 (suggestive mark weak because of "common third-party usage").

Plaintiff's mark peacefully coexists in a crowded field of third-party marks with the letter X. *See* Exs. 25, 31, 32, 33; Ex. 12, No. 3. Plaintiff admitted that marks like  for advertising business services;  for advertising and customer reward programs;  for brand concept and brand development services;  for brand development services;  for advertising, marketing and promotional services;

 for advertising and marketing consultancy;  for marketing consulting and advertising;  for advertising services;  for social media and brand marketing services;  for branding services;  for advertising services;  for advertising agency services; and many other similarly situated marks were "not identif[ied] [] as requiring objection or enforcement efforts." Ex. 13. Plaintiff was surprised to learn of other third parties like SocialXMedia, a full-service digital marketing firm; X Media Solutions, which provides social media advertising services; X Media, which offers social media services; X Agency, a marketing agency providing services for Facebook and Instagram; and X Marketing, offering digital marketing services. Ex. 4 at 210:3-219:2; 221:11-224:15; Exs. 32, 33. In short, Plaintiff not only lacks monopoly rights over the letter "X," its mark coexists in a sea of third-party marks containing the same letter and used for advertising services.

Indeed, Plaintiff's CEO described SocialXMedia as "look[ing] very similar to" Plaintiff and "doing the same thing [Plaintiff is] doing with the same name." Ex. 4 at 210:17–211:7; Ex. 33. Such third-party use diminishes whatever minimal distinctiveness Plaintiff's mark has and clearly rebuts any presumption of strength. *FIU Bd.* 830 F.3d at 1257-58 (lesser protection given 12 third-party uses of FLORIDA and UNIVERSITY in the same market); *Beaulieu Grp. LLC v. Mohawk Carpet Distrib., Inc.*, No. 4:15-CV-0124, 2017 WL 11634736, at *34 (N.D. Ga. Jan. 23, 2017) (15 third-party uses of EVER CLEAN in similar industries weakened strength of mark); *see also World Triathlon Corp. v. Dawn Syndicated Prods.*, No. 8:05-CV-983,

2007 WL 2875456, at *4-5 (M.D. Fla. Sept. 28, 2007), *aff'd*, 303 F. App'x 808 (11th Cir. 2008) (incontestable IRONMAN mark weak in light of third-party use).

Plaintiff also uses "many different X logos," each with different stylizations of the "X" portion of the mark and taglines like "A Facebook Marketing Agency" and "marketing with a mission." Ex. 4 at 23:1-2, 26:6-30:8; Exs. 37, 38, 42. This inconsistent use of a single version of the X SOCIALMEDIA mark further diminishes any strength of Plaintiff's mark by making it harder for consumers to identify a single source when viewing the mark. *See Fla. Virtual Sch.*, 710 F. Supp. 3d at 1154 (six logos in 25 years supported finding of weakness).

Any allegation that Plaintiff has spent large sums of money on advertising is similarly insufficient to establish its mark's commercial strength, because "it tells us precious little about the efficacy of those efforts in creating marketplace recognition of [the] mark." *FIU Bd.*, 830 F.3d at 1259. Plaintiff has produced no evidence that consumers recognize its mark in commerce. *See* Ex. 4 at 158:5-159:9.

### b.    Defendant Has Not Swamped Plaintiff's Reputation

In reverse-confusion cases, courts consider the relative commercial strength of the defendant's mark, and look for extensive advertising, public recognition, and if "the junior user was able to swamp the reputation of the senior user with a relatively much larger advertising campaign." *Wreal*, 38 F.4th at 129.

Although Defendant's communications platform may be well known as a tech

platform and mobile app[5], there is no evidence that Defendant set out to create a robust marketing campaign during or after its rebrand to X. *See Curity*, 2022 WL 18956198, at *4 (rejecting reverse confusion where "no evidence that [Defendant] employed a major advertising campaign[, took] efforts to flood the market with their product" or that "any such mass marketing is planned, or even consistent with [Defendant's] present business model."). Defendant does not advertise or target the legal advertising industry, there is no evidence that Defendant has somehow swamped Plaintiff's purported reputation in that market. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 304 (3d Cir. 2001) (strength of junior users mark in market X unlikely to affect consumers within senior user's market Y).

### 2. The Parties' Marks Are Different

In assessing similarity, courts examine the entirety of the "appearance, sound and meaning of the marks, as well as the manner in which the marks are used." *FIU Bd.*, 830 F.3d at 1260 (citations omitted). "Overwhelming visual dissimilarity can defeat an infringement claim, even where the other six factors all weigh in favor of the plaintiff." *Welding Servs.*, 509 F.3d at 1361 (affirming summary judgment where dissimilar marks outweighed similarity of services, sales, advertising, and confusion).

Other than incorporating an "X," one of 26 letters used by hundreds of other companies, the parties' marks are distinct. Plaintiff's mark is displayed in color, with its highly stylized use of a human stick-figure "X" holding the scales of justice. Other

---

[5] Many users refer to X alongside its previous name, Twitter. Ex. 1 at 81:7-10; Ex. 20 at 7,11; Ex. 22. Plaintiff's own expert opines that "X" is not top of mind, because of "various reports [that] consumers still refer[] to the social media platform offered by X Corp. as "Twitter."" Ex. 72 at 19.

uses of Plaintiff's logo mention that it is a "Facebook Advertising Agency" and its role in mass torts. Exs. 37, 38, 42, 44, 47. Defendant's use of "X" is black and white, with a double line on half of the "X." *Compare id.*, *with* Ex. 17.

That both parties use the letter X does not create a factual dispute because a shared term "is not enough to find the marks confusingly similar, as extensive third-party use lessens the probability of confusion." *Unleashed Mag.*, 2008 WL 11336608, at *6. "[S]light differences in names may be meaningful because consumers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other." *FIU Bd.*, 830 F.3d at 1260 (citations omitted) (FIU and FNU not similar given meaning and third-party use). Plaintiff's CEO appears to agree, finding that third-party mark "X Media Solutions" was not confusingly similar, in part because the mark is "missing [the word] social." Ex. 4 at 224:8-14.

Given the significant differences between the parties' marks in the crowded field of X marks, no reasonable factfinder could conclude that the marks are similar. *See, e.g., Welding Servs.*, 509 F.3d at 1361 (WSI and WTI not similar); *World Triathlon*, 2007 WL 2875456, at *5-6 (shared use of IRONMAN not similar); *Bell Lab'ys, Inc. v. Colonial Prods., Inc.*, 644 F. Supp. 542, 547 (S.D.Fla.1986) (FINAL FLIP and FLIP on same product were not similar).

### 3.    The Parties Offer Different Services and Products

The relevant question here is "whether the goods are so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods." *World Triathlon*, 2007 WL 2875456, at *6. Even where two parties offer

overlapping services, confusion is less likely if the parties are in different industries. *Tarsus Connect, LLC v. Cvent, Inc.*, 452 F. Supp. 3d 1334, 1353-54 (N.D. Ga. 2020) (factor weighed against confusion where the parties' primary service offering was different even though both offered some overlapping services).

Plaintiff provides expensive legal advertising services to mass tort lawyers (a niche and sophisticated audience) to recruit plaintiffs for class action lawsuits. Ex. 4 at 22:6; 25:23-26:1; Exs. 28, 41, 46. Plaintiff develops, designs, and executes targeted advertising on social media (predominately Facebook) to help identify, screen, and sign up individuals for plaintiff class actions. Ex. 4 at 30:2-3, 41:23-42:19.

By contrast, Defendant offers, and is known for, a free social networking platform that allows the public to share news, photos, audio and video in real-time. Ex. 11, No. 2; Ex. 4 at 78:16-20; Ex. 6 at 58:8-14; Ex. 1 at 19:21-24. Defendant also provides subscription services for a fee for access to additional features on the platform, like identity verification and enhanced access to AI. Ex. 1 at 21:10-23:19. Defendant's platform also functions as a mobile billboard that allows business customers to publish advertisements on its platform. Ex. 1 at 60:17-62:16. Unlike Plaintiff, Defendant does not create any advertisements. *Id.* at 62:14-16. Defendant is first and foremost a tech-first company, focused on expanding into services like peer-to-peer payments and encrypted messaging that Plaintiff does not provide. *See* Ex. 6 at 40:15-17, 58: 8-14; Ex. 1 at 102:2-18.

Other than its CEO's self-serving say-so, Plaintiff has no evidence to support its theory that X Corp. is a competitor. *See* Ex. 4 at 33:5-22, 73:1-80:19. Even if law

14

firms could use Defendant's platform to publish advertisements, there is no evidence that Defendant offers the same legal lead generation and creative campaign services to law firms that Plaintiff provides—because Defendant does not. Ex. 1 at 60:17-62:16. And conversely, law firms cannot post advertisements on a platform operated by Plaintiff, because Plaintiff does not own or operate such a platform. Ex. 12, No. 4.

Plaintiff has no objective evidence that prudent consumers would believe a mass tort advertising firm like Plaintiff's would also operate a social media platform like Defendant's. Mr. Malherbe's theory that Defendant is in Plaintiff's "realm" is based on nothing more than the fact that X Corp. is a "large" company. Ex. 4 at 219:3-19. But Plaintiff has no trouble distinguishing its services from other third-parties using "X." Ex. 4 at 210:3-219:19 (opining that designing "content for social media" is different than designing an "ads for social media," and concluding "you could say it's the same, but it's not really").[6] This factor favors Defendant.

4.    **Parties' Sales Outlets and Customer Bases are Different**

The sales factor looks at "where, how, and to whom the parties' products are sold." *FIU Bd.*, 830 F.3d at 1261 (citation omitted). "Dissimilarities between the manner of sale and the typical customers of the parties' services lessen the possibility of confusion." *Id.* "A potential customer is one who might some day purchase this kind of product or service and pays attention to brands in that market."[7] *Unleashed*

---

[6] Defendant has also submitted an expert report concluding that Plaintiff and Defendant operate in different product categories. Ex. 70. Plaintiff purports to rebut Golder, which is the subject of a contemporaneously filed *Daubert* motion, and is likely to be excluded. *See Daubert* Motion § III.A.

[7] Plaintiff's claimed "secondary consumers" are not actual or potential customers of its services, as Plaintiff does not generate revenue from those consumers, and uses an entirely different mark and

*Mag.*, 2008 WL 11336608, at *9. The mere possibility of consumer overlap is not sufficient to give rise to a likelihood of confusion. *Id.* at *7. And understandably, when a party's target consumer is a sophisticated buyer, the likelihood of confusion is diminished. *See Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1185 (11th Cir. 1985); *see also Tarsus Connect*, 452 F. Supp. 3d at 1354 (finding customers' sophistication lowered the likelihood of confusion).

Plaintiff's target consumers are sophisticated lawyers and law firms that spend thousands of dollars on advertising campaigns. *See United Country Real Est., LLC v. United Realty Grp., Inc.*, No. 16-CV-60154, 2017 WL 4324634, at *7 (S.D. Fla. Sept. 29, 2017) ("educated, licensed professionals" are generally sophisticated); Ex. 4 at 42:4-5, 159:10-160:13. Plaintiff's sales methods require continued contact with a sophisticated customer, making it unlikely that anybody would emerge from the lengthy sales process and spend thousands thinking it was doing business with Defendant instead of Plaintiff. *See* Ex. 4 at 54:8-56:25; Exs. 21, 70.

Defendant offers a free online platform to the public. Defendant's paid service offerings do not target law firms, but instead have diverse, sophisticated clientele like Paramount, NFL, UberEats, and Zillow. Ex. 11, No. 8; Ex. 1 at 50:11-51:4. That lawyers may use the platform as a communications tool would dispel, rather than create confusion— those who use the X platform are familiar with its features, which does not include the creation and care of mass tort campaign services that Plaintiff provides. This factor too weighs in Defendant's favor.

---

brand to target those consumers. Ex. 4 at 159:22-160:13; Ex. 7 at 122:16-123:8; 124:19-125:8.

### 5. The Parties Advertise Differently

The similarity of advertising "factor looks to each party's method of advertising." *Wreal*, 38 F.4th at 135 (citation omitted). "[T]he standard is whether there is likely to be significant enough overlap in the readership of the publications in which the parties advertise that a possibility of confusion could result." *Id.*; *Freedom Sav. & Loan*, 757 F.2d at 1185 (affirming dissimilarity of advertising based on different expenditures and predominate focus on different mediums).

Plaintiff predominately advertises through newsletters, books, magazines and participation in tradeshows and conferences, all focused on mass torts or personal injury law. Exs. 36, 39, 40, 43, 45; Ex. 9 at 131:23-132:13, 140:7-141:8; Ex. 4 at 90:22-96:23. Defendant advertises through client invite-only events, attendance at select tech-focused tradeshows, and its own app. Ex. 6 at 27:22-28:18; Ex. 11, No. 8; Ex. 18. Plaintiff admits it has never seen Defendant publish a mass tort newsletter or at any of the dozens of tradeshows it has attended (because Defendant has not done either). Ex. 4 at 79:24-80:2, 91:10-12, 93:8-13, 94:15-17, 95:23-25, 96:21-23. No reasonable factfinder could conclude that there is any overlap between the advertising for Plaintiff's legal advertising and Defendant's communications platform.

### 6. There is No Evidence that Defendant Acted in Bad Faith

In reverse confusion cases courts look at whether "a defendant deliberately intended to push the plaintiff out of the market by flooding the market with advertising" or otherwise culpably disregarded a risk of reverse confusion. *Wreal*, 38 F.4th at 136 (citation omitted). There is no evidence that Defendant was aware of

17

Plaintiff and its niche advertising firm when Twitter merged into X Corp. and later launched its new X logo. Ex. 11, No. 1; Ex. 1 at 42:3-11. Defendant independently adopted its own X mark in good faith, based on its founder's decades long history with the letter X, including owning X.com, which predates Plaintiff's use of its own mark. Ex. 11, No. 1; Ex. 1 at 18:19-25, 70:4-24. Further, given the foregoing analysis of the other confusion factors, there is no risk of reverse confusion that Defendant could have plausibly disregarded. *See supra* § I(A)(1-5).

### 7.    There Is No Plausible Evidence of Actual Confusion

Actual confusion typically requires that a "deceived customer buy[] the infringer's product in the belief that . . . it in some way is affiliated with the owner of the trademark[.]" *Most Worshipful Nat'l Grand Lodge v. United Grand Lodge GA AF & AYM, Inc.*, 813 F. App'x 455, 459 (11th Cir. 2020). Here, there is no evidence of a single diverted sale. Ex. 12, No. 7. That is a "powerful indication that the junior trademark does not cause a meaningful likelihood of confusion," particularly where, as here, there was enough opportunity for confusion to occur. *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1362 (11th Cir. 2019) (citation omitted).

Courts examine evidence of confusion only by those persons in the "relevant consumer group"—*i.e.*, actual or potential customers—"not the general public." *See Unleashed Mag.*, 2008 WL 11336608, at *9-10. Plaintiff has no evidence of confusion from "ordinarily prudent" customers of its business. *See id.* Plaintiff has purported to identify instances of alleged confusion where it was faced with "inquiries," Ex. 15, No. 5, but Plaintiff admits those inquiries are not confusion, did not come from its

target consumer or potential clients, and were not "worth [Plaintiff's] time" to correct because they were not likely consumers of Plaintiff's services. Ex. 4 at 87: 20-21, 88:10-12, 118:12-145:5; Ex.3 at 46:20-47:18; Ex. 7 at 145:14-151:6.

At most, Plaintiff has identified two instances of confusion from those in the legal industry, and neither are representative of Plaintiff's typical or "ordinarily prudent" customer. *Unleashed Mag.,* 2008 WL 11336608, at *9-11 (evaluating evidence "in light of the totality of the circumstances"). Erik Christiansen, a lawyer who questioned the affiliation between Plaintiff and Musk stated he would *never* retain an advertising agency to help generate client leads. Ex. 2 at 11:23-12:8. Christiansen has never advertised on Facebook, worked in mass tort litigation, heard of Plaintiff's competitors, and never attended the trade shows Plaintiff attends. There can be no dispute he is not an actual or potential consumer of Plaintiff's services. Ex. 2 at 8:11-9:6, 9:21-10:20, 11:13-22. Additionally, Elijah McNally of the ASWT Firm, who was purportedly confused while setting up a meeting with Plaintiff after 4 months in his role, is not a representative consumer of Plaintiff's services, and has no decision-making authority. Ex. 5 at 10:17-19; 27:16-22; 30:6-9; 34:4-12; 48:10-51:6; *Suntree Techs.*, 802 F. Supp. 2d at 1285 (disregarding on summary judgment single instance of confusion because individual did not encounter mark under ordinary circumstances, "had very little to do with" purchase and was "not involved" in decision, and even if credible would constitute only *de minimis* confusion). Not only did McNally's purported confusion not result in any harm, but his firm's decision not to retain Plaintiff's services had nothing to do with confusion and everything to do

19

with dissatisfaction with Plaintiff's services on prior occasions. Ex. 5 at 28:19-25; 30:6-14; 34:4-12; *Fla. Virtual Sch.*, 710 F. Supp. 3d at 1157 (not actual confusion where "[i]t was Plaintiff's delay . . . that ultimately led to [consumer's] decision to [take services elsewhere]—not confusion between the parties' names."). "Incredible" evidence of alleged confusion is appropriately disregarded at summary judgment. *Tana*, 611 F.3d at 779 (affirming summary judgment where plaintiff's evidence of actual confusion was incredible in light of product differences).

Even if these two instances constitute confusion, the confusion's extent matters. *Tana*, 611 F.3d at 779 (when defendant has served over one million customers, two or three instances of customer confusion is insufficient). Defendant has hundreds of millions of users; Ex. 19, and Plaintiff sends out a newsletter roughly every two weeks to over 30,000 individuals, Ex. 4 at 47:1-2, 11-13. These numbers, contrasted with the two emails produced in this case as evidence of purported confusion by lawyers or law firms, represent at most, *de minimis* confusion, and are insufficient to raise a triable fact issue. *See Nat'l Grand Lodge*, 813 F. App'x at 459 (three or four instances of confusion insufficient to raise genuine issue of material fact because no evidence that there was actual confusion in the consuming public); *see also Unleashed Mag.*, 2008 WL 11336608, at *10 (same).

Plaintiff's separate theory of initial interest confusion is not legally cognizable in this Circuit and does not raise a genuine issue of material fact. *Suntree Techs.*, 802 F. Supp. 2d at 1280-81 (rejecting initial interest confusion and granting summary judgment); *Pro Video Instruments, LLC v. Thor Fiber, Inc.*, No. 6:18-CV-1823, 2020 WL

11421203, at *18 (M.D. Fla. Apr. 22, 2020) (concluding initial interest doctrine is "not actionable in the Eleventh Circuit" and granting summary judgment). This is because if claimed similarities are likely to be clarified before a purchase, they will not result in any real confusion or a diverted sale. *See id.*; *see also Vital Pharm., Inc. v. Am. Body Bldg. Prods.*, LLC, 511 F.Supp.2d 1303, 1318 (S.D.Fla.2007) (rejecting theory, finding it "unpersuasive."). Plaintiff's CEO has admitted as much, noting "[t]here's been questions asked, but that's, to me, is not confusion." Ex. 4 at 87:20-21.

Moreover, Plaintiff does not have any affirmative survey evidence to support its claims. To the contrary, and while not necessary to grant Defendant's motion, Defendant has introduced evidence from its expert, Hal Poret, putting forth a survey which confirms the absence of confusion. *See* Ex. 71. "[W]ith no survey, Plaintiff, has no way to filter out latent marketplace confusion." *Fla. Virtual Sch.*, 710 F. Supp. 3d at 1159 (concluding "Plaintiff's inability to present any credible evidence of actual confusion causes this factor to weigh heavily against its claims," "especially []where potentially millions of consumers were exposed to the infringing mark.").

\*      \*      \*

No trier of fact could reasonably conclude that Defendant's different X mark for different services and consumers, in different channels of trade, with different advertising, could give rise to a likelihood of confusion—especially given the crowded field. Accordingly, Defendant is entitled to summary judgment.

## II.    **Alternatively, Plaintiff's Claims for Monetary Relief Should be Dismissed**

### A.    **Plaintiff Has No Evidence of Actual Damages**

Even if Plaintiff could succeed on its claims, it cannot recover actual damages. It has not disclosed or quantified its purported harm and it has no evidence of harm. "Recovery of damages for trademark infringement is subject to the usual standards of damages: plaintiff must prove *both* causation and amount." McCarthy § 30:72.

First, Plaintiff's failure to disclose a computation of damages in its initial disclosures, or to update those disclosures in the last 15 months of discovery, is reason alone to preclude damages. *See* Ex. 10 at 2-3; *Vital Pharms., Inc. v. Monster Energy Co.*, No. 21-13264, 2022 WL 3083273, at *3-4 (11th Cir. 2022) (affirming exclusion of plaintiff's "actual-damages theories" when plaintiff "fail[ed] to provide damages information required by Rule 26(a)"). Rule 26(a) required Plaintiff to disclose a "computation of each category of damages claimed" as well as "the documents or other evidentiary material . . . on which each computation is based." Fed. R. Civ. P. 26(a)(1)(A)(iii). While Plaintiff produced financial statements, Rule 26(a) demands more than the production of "undifferentiated financial statements." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 295 (2d Cir. 2006). Plaintiff needed to, but did not, "perform some analysis" or provide Defendant with notice of the amount of actual damages claimed and the methodology by which it was calculated. *Boldstar Tech., LLC v. Home Depot USA*, No. 07-cv-80435, 2008 WL 11320010, at *2 (S.D. Fla. Feb. 28, 2008); *see also Vital Pharms.*, 2022 WL 3083273, at *3. Despite requests for same, Plaintiff never did so, either in writing or at depositions. *See* Ex. 10 at 2-3; Ex. 75 (responses from Plaintiff's counsel in blue); Ex. 13, No. 9; Ex. 15, No. 7; Ex. 9 at 118:2-119:17, 217:10-219:17, 229:1-4, 231:12-21.

Plaintiff's claim that its "revenue has decreased in a manner that correlates with Defendant's adoption of its X mark," Ex. 15, No. 7, is based entirely on speculation. Plaintiff's CEO admitted that he has no analyses, "no data," and just "beliefs." Ex. 4, 169:6-177:19; *see also* Ex. 7 at 181:18-183:23 (confirming no investigation, analysis or data on revenue decline and confirming speculation as to cause). Further, Plaintiff's former President testified that the entire legal marketing services industry was on a downward trajectory from 2022 through 2024, and nothing but speculation could tie that to Defendant. Ex. 7 at 35:21-37:6, 192:1-195:3. Plaintiff's reliance on unsupported and speculative lay-opinion testimony cannot defeat summary judgment, particularly where Plaintiff has not submitted expert testimony. *See KW Plastics v. U.S. Can. Co.*, 131 F. Supp. 2d 1265, 1275 (M.D. Fla. 2001) ("A projection of lost profits will often . . . require some form of expert testimony."); *Water Craft Mgmt. v. Mercury Marine*, 638 F. Supp. 2d 619, 626 (E.D. La. 2009) ("[T]he complex issues underlying the determination and causation of business losses require the application of specialized knowledge.").

Plaintiff further claims that "marketing efforts that were successful in the past for advertising of its services and increasing revenue have not been as successful . . . since Defendant's adoption [of the] 'X' mark," are similarly unsupported. Ex. 15, No. 7. Plaintiff's marketing expenditures in 2023 show it spent significantly less on marketing than in prior years, and abandoned its use of sponsored Google advertising, arguably accounting for Plaintiff's "unsuccessful marketing efforts." *See* Ex. 35; Ex. 9 at 89:23-92:2, 98:12-100:5. Moreover, Mr. Potter, founder and

managing attorney of RDP Law Group, confirmed that the success of RDP ad campaigns entrusted to Plaintiff were the same both before and after Defendant's rebrand. Ex. 7 at 68:2-69:14. And Plaintiff is now on track for its second-best year of business yet, despite coexisting with Defendant. Ex. 9 at 232:9-235:15.

The record evidence actually shows that Plaintiff's declining revenue was attributable to any of several factors unrelated to Defendant. Ex. 4 at 180:18-182:5, 173:5-175:11; Ex. 9 at 22:21-23:13; 238:13-25, 239:5-240:25, 243:2-5, 246:10-20; Ex. 3 at 32:7-20, 59:13-61:14, 62:5-63:19; Ex. 7 at 113:17-115:25, 195:9-199:3 ( customer complaints, faulty tech,[8] millions in customer refunds, subpar client experiences); Ex. 51 ("market fluctuations," "mistakes," "lack of control," and competitors at "one-third of the cost"); *see also* Ex. 5 at 28:19-25, 29:13-30:14, 34:4-12, 35:23-36:7; Exs. 50, 52, 53, 54, 55, 58, 59, 60 (complaints regarding Plaintiff).

In sum, there is no evidence from which the trier of fact could conclude that Defendant caused Plaintiff any damages. *See e.g., EsNtion Records, Inc. v. TritonTM, Inc.*, No. 3:07-CV-2027, 2009 U.S. Dist. LEXIS 106370, at *21-26 (N.D. Tex. Nov. 13, 2009) (granting summary judgment where "no evidence of actual damages"); *Illinois Tool Works, Inc. v. Rust-Oleum Corp.*, 955 F.3d 512, 516 (5th Cir. 2020) (reversing corrective advertising award based on pure speculation).

### B.    **Plaintiff Is Not Entitled to an Accounting of Profits**

Plaintiff seeks an accounting, or disgorgement, of X Corp.'s profits, for a

---

[8] Clients were increasingly frustrated with Plaintiff's "portal," after the employee who created it left the company in July 2023, the same time Twitter re-branded to X. Ex. 3 at 95:7-97:1; Ex. 9 at 26:2-7.

similarly yet-to-be disclosed amount. Disgorgement is an imperfect but equitable proxy for allegedly diverted sales, designed to avoid unjust enrichment or deter willful infringement. *Hard Candy*, 921 F.3d at 1348. But disgorgement is unavailable as a matter of law in reverse-confusion cases like this one, and Plaintiff cannot show that principles of equity would require such a remedy. *See Fabick, Inc. v. JFTCO, Inc.*, 944 F.3d 649, 659 (7th Cir. 2019) ("[R]everse confusion cases present meager justification for profit awards"); McCarthy § 23.10 (awarding profits "is not a proper basis for recovery" in reverse confusion cases); *see also Fla. Virtual Sch.*, 710 F. Supp. 3d at 1159 ("Nor can Plaintiff demonstrate that its miniscule evidence of potential customer confusion justifies the millions it seeks in disgorgement damages.").

## CONCLUSION

For the forgoing reasons, Defendant is entitled to summary judgment.

*/s/ Megan K. Bannigan*
Megan K. Bannigan (Lead Counsel)\*

| | |
|---|---|
| Dustin Mauser-Claassen | David H. Bernstein\* |
| Florida Bar No. 0119289 | Jared I. Kagan\* |
| Quinn B. Ritter | Nicole M. Flores\* |
| Florida Bar No. 1018135 | Debevoise & Plimpton LLP |
| KING, BLACKWELL, ZEHNDER, | 66 Hudson Blvd |
| & WERMUTH, P.A. | New York, NY 10001 |
| 25 E. Pine St., P.O. Box 1631 | Telephone: (212) 909-6000 |
| Orlando, FL 32802-1631 | mkbannigan@debevoise.com |
| Telephone: (407) 422-2472 | dhbernstein@debevoise.com |
| dmauser@kbzwlaw.com | jikagan@debevoise.com |
| qritter@kbzwlaw.com | nmflores@debevoise.com |
| | *\*Admitted pro hac vice* |

**CERTIFICATE OF SERVICE:** I HEREBY CERTIFY that, on June 4, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Dustin Mauser-Claassen*
Dustin Mauser-Claassen (Florida Bar No.: 0119289)
