## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

X SOCIAL MEDIA LLC,

          Plaintiff,

v.

X CORP.,

          Defendant.

Case No. 6:23-CV-01903-JA-UAM

**DEFENDANT X CORP.'S CORRECTED\* DAUBERT MOTION TO EXCLUDE CERTAIN TESTIMONY AND OPINIONS OF DAVID J. FRANKLYN**

## PRELIMINARY STATEMENT

Under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and Fed. R. Evid. 702, Defendant X Corp. respectfully moves to exclude the rebuttal opinions in Sections IV-5, V-5, VII, and VIII (the "Franklyn Rebuttal Opinions") of the Rebuttal Report of David J. Franklyn (the "Franklyn Report"), submitted by Plaintiff X Social Media.

Defendant seeks to exclude opinions in the Franklyn Report that are based on insufficient, and often inaccurate, facts and data and/or are devoid of support in expertise, experience, methodology, or relevant principles. Several opinions in the Franklyn Report rest on a critical misunderstanding of Plaintiff's services, including the way Plaintiff interacts with what Franklyn calls "secondary consumers" (*i.e.*, not Plaintiff's clients, but clients of Plaintiff's clients). Further, several opinions consist of sweeping, unsupported conclusory statements, made without the requisite experience or expertise, and are untethered from any reliable methodology or accepted authority,

---

\* This motion is corrected to include a certificate of conferral pursuant to Local Rule 3.01(g).

or available facts and testimony in this case. For the reasons below, the Court should exclude the Franklyn Rebuttal Opinions.

## BACKGROUND

This suit for trademark infringement and related claims concerns the parties' respective uses of the letter "X," as shown below. Plaintiff asserts a reverse confusion theory, contending that, because Defendant began using an "X" mark for its services, consumers might be "led [] to believe that [Plaintiff's] advertising services are being offered by or are associated with X Corp." Doc. 1 at ¶ 22.[1]



Plaintiff is an advertising agency focusing exclusively on lead generation for lawyers specializing in plaintiff-side mass tort and class action litigation (*i.e.*, it helps lawyers find potential class action plaintiffs). Ex. 4 at 39:16-21; 43:12-16.[2] As Plaintiff's CEO described, Plaintiff's services follow an industry-specific procedure. After an initial intake meeting to explain Plaintiff's services to clients, Plaintiff designs "advertising [for the client that] will get put up on Facebook." Ex. 4 at 56:6-25, 57:17-23. The Facebook ads do not include any reference to X SOCIALMEDIA. Ex. 4 at

---

[1] Indeed, this Court has already recognized that this case specifically concerns *reverse* confusion. Doc. 41 at 5 ("Here, both parties acknowledge reverse confusion as the correct designation for this set of facts[.]").

[2] All references to Ex. _ refer to exhibits attached to the Declaration of Jared I. Kagan in Support of Defendant's Motion for Summary Judgment and *Daubert* Motion to Exclude Certain Testimony and Opinions of David J. Franklyn, filed contemporaneously herewith.

148:19-149:20. The ads include a "Learn More" button, so that if a potential class action plaintiff (*i.e.*, a potential client to the law firm, not Plaintiff) is interested, he or she can click the link to be taken to an external webpage (or "landing page") for the law firm client, also designed by Plaintiff, for more information and details on the class action opportunity. Ex. 4 at 57:21-25, 58:8-59:9. The vast majority of the landing pages Plaintiff creates do not contain any reference to Plaintiff. *See, e.g.*, Exs. 62-65. During the discovery period, Plaintiff produced only one campaign that included its name on the landing pages.[3] Plaintiff's target clients are law firms that bring class action lawsuits. Ex. 4 at 80:15-19. Plaintiff does not market its advertising services offered under the X SOCIALMEDIA mark to the potential class action plaintiffs that may engage Plaintiff's clients for legal services. Ex. 7 at 125:1-8.

In contrast, Defendant operates a social media platform, formerly known as Twitter, that is available to the general public. Ex. 11, No. 2. Defendant's platform allows registered users to post, upload, view, and share news, information, photos, audio and video content. *Id.*

On December 6, 2024, Defendant produced two expert reports: (i) the Expert Report of Hal Poret (the "Poret Report," Ex. 71), describing a consumer perception survey testing for likelihood of reverse confusion (the "Poret Survey") and concluding that there was no likelihood of confusion between the parties' marks (Ex. 71 at 60-61),

---

[3] On June 4, 2025, at 7:06 PM EDT, less than five hours before the midnight deadline to file *Daubert* motions and as Defendant was finalizing its motion, Plaintiff served Defendant with a production of documents that it purports to rely on. Defendant intends to file a motion pursuant to Fed. R. Civ. P. 37 to preclude Plaintiff from relying on these untimely produced documents.

and (ii) the Expert Report of Peter Golder (the "Golder Report," Ex. 70), which, based upon Professor Golder's three decades of experiences as a professor of marketing at Dartmouth's Tuck School of Business and New York University's Stern School of Business, and well-established principles of marketing, concluded that Plaintiff's theory of reverse confusion is inconsistent with the facts of this case (Ex. 70 at ¶ 57).

On February 4, 2025, Plaintiff produced the Rebuttal Report of David J. Franklyn (Ex. 72[4]). Franklyn, an intellectual property law professor at Arizona State University, posits several criticisms of both the Poret Report and Golder Report. At issue in the present Motion is (i) Franklyn's critique that the Poret Survey universe was underinclusive (the "Underinclusive Universe Opinion") (Ex. 72 at 11, 25-26); and (ii) all of Franklyn's critiques of the Golder Report (the "Golder Rebuttal Opinions") (Ex. 72 at 29-43).

## LEGAL STANDARD

Only relevant and reliable expert testimony is admissible. *Daubert*, 509 U.S. at 589. Under Rule 702, a witness must be qualified based on their knowledge, skill, experience, training, or education. *See* Fed. R. Evid. 702. A witness who is qualified as an expert "may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that" four prerequisites are met. *First*, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed.

---

[4] While Defendant has attached the Franklyn Report in its entirety, for the avoidance of doubt, the Court has stricken Sections IX-XIV. Doc. 70.

R. Evid. 702(a)-(d). *Second*, "the testimony is based on sufficient facts or data." *Id.* *Third*, "the testimony is the product of reliable principles and methods." *Id.* And *fourth*, "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." *Id.*

"The Rules of Evidence—especially Rule 702" require judges to act as gatekeepers, ensuring "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). To be reliable, an expert's opinions must be rooted in real science or principles—*i.e.*, be "intellectually rigorous"—and empirically testable. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1346 (11th Cir. 2003); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). The Eleventh Circuit has adopted a "rigorous three-part inquiry" to determine expert testimony's admissibility under Rule 702. *Frazier*, 387 F.3d at 1260. Under this inquiry, the Court must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005) (citations omitted).

The expert testimony's proponent carries a "substantial burden under Rule 702" to demonstrate that all these prongs have been met. *Cook v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1107 (11th Cir. 2005); *Bostick v. State Farm Mut. Auto. Ins. Co.*, 321 F.R.D.

414, 417 (M.D. Fla. 2017). Plaintiff cannot meet that burden, and the Court should exclude the Franklyn Rebuttal Opinions.

**ARGUMENT**

**I.     THE COURT SHOULD EXCLUDE THE "UNDERINCLUSIVE UNIVERSE OPINION" (SEC. IV-5; SEC. V-5).**

Franklyn opines that the "Poret Survey universe is underinclusive." Ex. 72 at 25. The Court should exclude that opinion because it is based upon a fundamentally flawed and incorrect assumption made without sufficient (or even accurate) facts and data. *Frazier*, 387 F.3d at 1261.

Poret conducted an Eveready Survey, a "standard and widely accepted survey format" that is considered "the gold standard" for cases involving likelihood of confusion. J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition [hereinafter "McCarthy"], § 32:174 (5th ed.); *see also id.* at n.3. Defining the proper universe of survey respondents is critical to ensure that only relevant consumers are surveyed.[5] Leading authority makes clear that the universe in a reverse confusion survey should include only the "senior user's *customer base*," which here includes only Plaintiff's law firm clients. McCarthy § 32:159 (emphasis added). The Poret Survey "consisted of U.S. professionals age 21 and older who meet the following criteria: (i) [w]ork for a law firm/legal practice that is an actual or prospective consumer of social media advertising services; (ii) [w]orks for an advertising/market research firm

---

[5] *See* McCarthy § 32:159 ("Selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant.").

6

that offers social media advertising services in the legal industry." Ex. 71 at 37. Poret explained that the universe he selected was appropriate "because such individuals are actual or prospective consumers of the types of services offered by Plaintiff" (*i.e.*, the "senior user"). Ex. 71 at 37.

In rebuttal, Franklyn contends that the Poret Survey universe was underinclusive because "it fails to survey every class of consumers who are exposed to the relevant mark" and "fails to account for consumers who will encounter the 'X Social Media' marks in the form of the advertisements that X Social Media produces on behalf of their direct clients." Ex. 72 at 11, 25-26. Franklyn further asserts that Poret's survey universe was underinclusive because it does not capture "ordinary consumers simply in the market for legal services generally." *Id.* This opinion should be excluded for four, independent reasons:

***First,*** the Underinclusive Universe Opinion should be excluded because Franklyn failed to disclose the materials on which he based the opinion. *See United States v. Frazier*, 387 F.3d at 1261 ("[I]t remains a basic foundation for admissibility that '[p]roposed [expert] testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known.'"). Franklyn contends that the Facebook advertisements that Plaintiff creates for its clients include Plaintiff's name, that potential class action plaintiffs "who are looking for lawyers . . . see [Plaintiff's] logo on Facebook, with some regularity," that those consumers might associate Plaintiff with X and Musk, and that Plaintiff's reputation would be harmed by that "misunderstanding of potential affiliation." Ex. 61 at 55:16-56:23. When asked if he

7

was aware of posts on Facebook referencing Plaintiff, Franklyn testified, "the ones that I saw did." *Id.* at 45:8-10. Franklyn, however, did not identify any such advertisements in his Report, and in forming his opinion, Franklyn testified that he "relied on [his] knowledge" that Plaintiff's name appears in the advertisements on Facebook, without any additional support. *Id.* at 45:25-46:9.

It is unsurprising that the Franklyn Report fails to identify any such documents. As described below, Plaintiff's CEO, Jacob Malherbe, testified that Plaintiff does not include its name on Facebook advertisements. Ex. 4 at 148:19-149:20. By Plaintiff's own admission, no such documents exist. Thus, record evidence discredits the entire premise underlying Franklyn's opinion and the opinion should be excluded.

***Second,*** the opinion should be excluded because it is based on an unsupported, flawed assumption. Franklyn assumed, in forming his opinion, that the sample landing page he was provided was an "ad" viewable on Facebook. Ex. 61 at 62:24-63:1. Testimony from Plaintiff's executives, however, confirms that the Facebook ads created by Plaintiff are distinct, and serve different purposes, from the landing pages Plaintiff creates. Those landing pages (including the one on which Franklyn based his opinion) are entirely external to the Facebook platform. Ex. 4 at 57:17-23, 59:7-9; Ex. 8 at 63:25-64:3. Despite this, Franklyn opined that, based on a landing page that he mistakenly labeled a Facebook "ad," ordinary consumers scrolling on Facebook might be exposed to Plaintiff's mark and presented with the opportunity to confuse Plaintiff and Defendant. Ex. 72 at 11, 25-26. He then criticized Mr. Poret for not including this class of consumers in his survey universe. *Id.*

8

Franklyn had no independent knowledge that Plaintiff creates external websites to operate as landing pages or where those landing pages are posted. Ex. 61 at 60:18-24. Franklyn testified that he understood, when forming his opinions, that the landing pages were, in fact, ads that appear on Facebook, even though the evidence contradicts his understanding. Ex. 61 at 62:24-63:1. Based on this incorrect understanding, Franklyn opined that Poret should have included in his universe of survey respondents individuals who would have seen what Franklyn erroneously believed to be a Facebook ad, which in fact never appears on Facebook at all, rendering his opinion unreliable and unhelpful. Accordingly, it should be excluded. *See Ferguson v. Bombardier Servs. Corp.*, 244 F. App'x 944, 949 (11th Cir. 2007) (opinion properly excluded when it was predicated on a false assumption belied by the evidence and thus unhelpful to the trier of fact).

***Third,*** even if Plaintiff's mark was displayed in the Facebook advertisements Franklyn purports to have seen (but did not disclose), the consumers who view those advertisements (*i.e.* potential class action plaintiffs) are not part of the relevant universe of *Plaintiff's* services. It is well established that consumer perception surveys, like the one Poret conducted, should include only likely *purchasers* of *Plaintiff's* services. *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 533 F. Supp. 75, 84 (S.D. Fla. 1981) (explaining that the appropriate universe for a likelihood of confusion survey "should include a fair sampling of those purchasers likely to partake" in the relevant goods or services) (citation omitted); *see also Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1323 (N.D. Ga. 2008) (same); *Honestech, Inc. v. Sonic Sols.*, 430 F. App'x 359, 362 (5th Cir.

2011) (same). The record confirms that the potential class action plaintiffs Franklyn claims were excluded from the Poret Survey are not likely purchasers of Plaintiff's services. Rather, they are potential clients of Plaintiff's clients. Specifically, the likely purchasers of Plaintiff's advertising services are law firms, not the "ordinary consumers simply in the market for legal services generally" that Franklyn contends were excluded from the Poret Survey universe. Ex. 4 at 80:15-19; Ex. 72 at 25-26.

Indeed, for the class of consumers Franklyn is concerned with (*i.e.* potential class action plaintiffs), Plaintiff purports to use an entirely separate brand, RightChoice Legal,[6] not X SocialMedia. Ex. 7 at 122:23-123:8. Plaintiff's former President, David Potter, explained that Plaintiff's primary market for the X SocialMedia brand was law firms and that Plaintiff "didn't necessarily market to the consumer base or plaintiff base" under that brand. Ex. 7 at 124:4-10. Mr. Potter explained that it was unimportant for Plaintiff to gain brand recognition among potential class action plaintiffs because consumers not looking for legal *marketing* services would not engage Plaintiff. Ex. 7 at 124:11-22. Mr. Potter confirmed that Plaintiff's "X SocialMedia" brand is a law-firm facing brand and that Plaintiff uses "RightChoice Legal" as a general consumer-facing brand. Ex. 7 at 125:1-8.

Because the consumers who would view Plaintiff's advertisements on Facebook are not the likely purchaser of Plaintiff's services, Franklyn's opinion that the Poret

---

[6] Plaintiff's former President, David Potter, testified that RightChoice Legal and X SocialMedia are "brand[s] for two different market[s] . . . [and] "target groups of clients." The former is directed towards class action plaintiffs and the latter (the only mark at issue in this case) is directed towards law firms. Ex. 7 at 122:16-123:8; 124:19-125:8.

Survey improperly excluded these consumers is not based in the facts of this case and should be excluded. *Ferguson*, 244 F. App'x at 949.

*Finally*, the record evidence directly contradicts Franklyn's opinion. As explained, Franklyn based his opinion Facebook advertisements he "has seen" (but not identified) which purportedly identify Plaintiff in the advertisement. But Plaintiff's CEO testified that the Facebook ads Plaintiff created on its clients' behalf *never* identify Plaintiff. Ex. 4 at 149:9-20. The Facebook advertisements Plaintiff produced in this case, none of which contain Plaintiff's name or logo, confirm this testimony. *See, e.g.*, Exs. 66-69. Though Plaintiff's testimony and documents were available to Franklyn, he reviewed neither in preparing his report, and instead relied on a misunderstanding that consumers see Plaintiff's name when scrolling on Facebook to form "the basis of [his] opinion." Ex. 61 at 60:2-8. And so, Franklyn's opinion is nothing more than a (demonstrably false) *ipse dixit* statement that should be excluded. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## II.    FRANKLYN IS NOT A MARKETING EXPERT.

Franklyn is unqualified to offer the "critiques" and "criticisms" of the Golder Report set forth in his Golder Rebuttal Opinions. Ex. 72, Secs. VII-VIII. Under Rule 702, an expert must be "qualified as an expert by knowledge, skill, experience, training or education." Franklyn lacks such qualifications in marketing, rendering his marketing opinions inadmissible. *See Hi-Tech Pharms. Inc. v. Dynamic Sports Nutrition, LLC*, No. 1:16-CV-949, 2021 WL 2185699, at *17 (N.D. Ga. May 28, 2021) (finding lack of qualifications to be an independent basis for the exclusion of expert testimony);

11

*see also Flexstake, Inc. v. DBI Servs., LLC*, No. 17-20858-CIV, 2018 WL 7629141, at *3 (S.D. Fla. Nov. 16, 2018) (granting *Daubert* motion based on lack of qualifications).

Franklyn holds a B.A. in History, Philosophy, and Religion, and a J.D. Ex. 73 at 2. He has no marketing degrees, no marketing-related work experience, no relevant training in marketing, has authored no articles on marketing, has never presented at or attended a marketing or advertising conference, and is not a member of any marketing-related professional organizations. Ex. 61 at 114:17-115:8; Ex. 73. His expertise is in intellectual property law. Over the past twenty-six years, Franklyn has held academic positions, but only briefly served as a "Professor of Business, Marketing and Advertising" from 2018-2021. Ex. 73 at 1. Franklyn confirmed that, aside from this short stint, he has never taught any other marketing courses. Ex. 61 at 113:25-114:2. And the "marketing" courses he did teach were unrelated to the marketing issues in this case. Ex. 61 at 112:7-113:17.

This is not the first time that Franklyn presented himself as an expert in an area where he lacks expertise, and courts have previously excluded Franklyn's opinions on that basis. *See AirWair Int'l Ltd. v. Pull & Bear Espana SA*, No. 19-cv-07641, 2021 WL 2914082, at *5-6 (N.D. Cal. July 12, 2021) ("[Despite being] a professor of Law and Business at Golden Gate University . . . Mr. Franklyn [did] not have experience regarding fashion and more specifically footwear, which [was] the subject of . . . the expert report to which he [was] offered to rebut."); *Jaguar Land Rover Ltd. v. Bombardier Recreations Prods., Inc.*, 2019 WL 13032105, at *2-3 (E.D. Mich. Jan. 4, 2019) ("[T]he

12

Court is not persuaded that Mr. Franklyn is a marketing and branding expert because of his experience teaching marketing courses.").

While the *Jaguar* opinion was entered during the nascency of Franklyn's professorship at Golden Gate, Franklyn's deposition testimony makes clear that the courses Franklyn taught were unrelated to the opinions offered here and that Franklyn has done nothing to further bolster his marketing expertise after his short tenure at Golden Gate. Ex. 61 at 112:7-114:2; *see also* Ex. 73. As in *Jaguar*, Franklyn's brief teaching experience is insufficient here, and the lack of higher education or publication history in marketing further demonstrate Franklyn's failure to satisfy Rule 702. *Flexstake, Inc.*, 2018 WL 7629141, at *3. Although Franklyn testified that he had been qualified to testify about marketing "three or four times," the two cases he could recall are distinguishable. *Roblox Corp. v. WowWee Grp. Ltd.*, No. 22-CV-04476, 2024 WL 4057418 (N.D. Cal. Sept. 3, 2024) (permitting Franklyn to offer rebuttal testimony to a marketing expert who offered opinions on trademark secondary meaning because Franklyn's critiques were rooted in trademark principles, with which he had experience); *Omnitracs, LLC v. Motive Techs., Inc.*, No. 23-CV-05261 (N.D. Cal.) (permitting Franklyn to offer marketing-related opinions where there was no objection from opposing party).[7]

---

[7] *Omnitracs* does not support the admission of Franklyn's testimony here because his qualifications were not challenged in that case. In any event, the circumstances of *Omnitracs* are distinct, as there, Franklyn "analyzed how [the relevant] systems were marketed within the industry," "who at [relevant] companies would make the decision to purchase," "who the competitors were in the relevant marketplace," and "talked to people at the client . . . [including] the director of marketing at the entity [] about the way the market worked." Ex. 61 at 107:7-108:11. Franklyn's deposition testimony confirms he did nothing of the sort here. Specifically, Franklyn testified that he did not talk to anybody

Simply put, Franklyn's three years teaching about brands "as a legal entity and as a marketing entity, and how those two things diverged and sometimes converged" along with "how [to] use surveys . . . [to] make [] advertising more appealing," Ex. 61 at 112:7-113:17, does not qualify him to rebut Golder's report, which is based on decades of marketing expertise, extensive education, teaching, research, and numerous peer-reviewed publications. Ex. 70 at ¶¶ 1-5, 13-14. Allowing Franklyn's unqualified opinions to rebut Golder's qualified opinions would flout the Eleventh Circuit's "rigorous" Rule 702 standard. *Compare* Ex. 70, App. A (Golder CV) *with* Ex. 73 (Franklyn CV); *see also Frazier*, 387 F.3d at 1260.

## III.  EACH OF FRANKLYN'S GOLDER REBUTTAL OPINIONS FAIL TO RELY UPON SUFFICIENT FACTS AND DATA, RELIABLE PRINCIPLES, AND/OR RELIABLE METHODS.

Even if Franklyn was qualified as a marketing expert, the Golder Rebuttal Opinions should be excluded because each opinion lacks any methodology or basis in marketing principles or academic literature and lacks an explanation of sufficient facts and data relied upon to form the conclusion. *Unleashed Mag., Inc. v. Orange Cnty.*, No. 06-cv-1690 (JA), 2008 WL 4304883, at *10 (M.D. Fla. Sept. 16, 2008) (excluding an expert opinion based "solely on [] experience . . . without any reviewable supporting data or methods" and declining to "simply take [the expert's] word for it that his considerable experience renders his opinion reliable").

---

at X Corp. to understand the services it offers, nor did he take any steps to research or learn about Plaintiff's competitors. Ex. 61 at 264:11-19; 255:8-10.

When Franklyn prepared his report, which extensively opines on the specific services offered by both parties, significant discovery material had been produced in the litigation. Whereas Golder reviewed several briefs filed by the parties, written discovery responses, and a significant set of documents produced during discovery, Franklyn relied, for the entirety of his Report, on only Plaintiff's Complaint and eight documents from Plaintiff's first production. *Compare* Ex. 70, App. C at 1-2 *with* Ex. 74 at 1.

Further, Franklyn cited only *two* academic articles (both of which support the same proposition) in the entirety of his Golder Rebuttal Opinions. *See* Ex. 72 at 41, n.117. Scholars predominately based abroad (in Italy and India) authored both articles and they, unsurprisingly, did not provide an analysis in the U.S. commerce context. Such a dearth of academic support contrasts sharply with Golder's extensive reliance on marketing scholarship and data, Ex. 70, App. C at 2-3, rendering Franklyn's opinions the "classic case of being asked to 'take the expert's word for it.'" *Unleashed Mag., Inc.*, 2008 WL 4304883, at *10 (citing *Frazier*, 387 F.3d at 1261).

### A.    The Court Should Exclude the Overlapping Services Opinion (Sec. VII-1; Sec. VIII-1).

Relying on significant marketing literature and discovery material produced in this case, Golder opined that Plaintiff and Defendant are in different product categories and that consumers can differentiate between similar brand names in different product categories. Ex. 70 at ¶¶ 17-39. Franklyn's Overlapping Services Opinion, which attempts to blur the differences between Plaintiff's and X Corp.'s

services, lacks sufficient facts, data, and any reliable, testable methodology. Ex. 72 at 30. Much of the information available to Franklyn, and even some that he cites, directly contradicts his opinions. *See McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004) ("[A]n expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions"); *see also Joiner*, 522 U.S. at 146.

Franklyn asserts that Plaintiff and X Corp. operate in highly overlapping product categories and often provide nearly identical services. Ex. 72 at 30. But Franklyn points to no supporting evidence. This lack of support pervades the Overlapping Services Opinion, where Franklyn repeatedly makes unsupported statements, inviting the Court to simply take him at his word. *See generally* Ex. 72 at 30-39.

At his deposition, Franklyn dismissed the peer-reviewed marketing literature Golder relied on as "mumbo jumbo."[8] Ex. 61 at 226:11-22. Yet nearly all of Franklyn's opinions fail to cite any literature at all. For example, arguing that Golder's marketing literature about consumer perceptions is inapplicable, Franklyn offers a "more appropriate" alternative analogy, but cites no supporting authority. Ex. 72 at 31. When asked if, in forming his rebuttal opinions, he reviewed the "mumbo jumbo" literature Golder cited, Franklyn admitted that he did not. Ex. 61 at 215:22-216:12. He further stated that although he considered some other unnamed literature, he did not cite any

---

[8] Quite the contrary, the Golder Report cites extensively to several highly-respected authorities in the field of marketing. *See* Ex. 70, App. C at 2-3.

"because [he] didn't rely on it for [his] opinions." Ex. 61 at 217:25-218:6, 219:8-17. Rather, Franklyn relied on his "general knowledge" without citing or relying on any methodologies or principles. Ex. 61 at 220:9-12.

Binding law is clear that "general knowledge" is not a proper basis for expert testimony, which instead must be grounded in sound methodologies and principles. *Frazier*, 387 F.3d at 1261-62. The Overlapping Services Opinion is nothing more than "[s]ubjective speculation that masquerades as scientific knowledge." *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005) (citation omitted).

Franklyn's opinion also lacks sufficient facts and data. In further support of his opinions that the parties operate in the same space, Franklyn claims that law firms advertise on Defendant's platform, but he provides no examples. Ex. 61 at 238:1-11. At his deposition, Franklyn conceded he could not, outside of his own "belie[f] that there are some," confirm whether any law firms actually advertise on X Corp.'s platform. Ex. 61 at 238:16-25. Without actual data, Franklyn cannot reasonably conclude that Defendant's "advertising services overlap with those offered by X Social Media," which he concedes are "mostly focused on personal injury and mass tort lawyers." Ex. 72 at 37; Ex. 61 at 262:17-19. Indeed, despite drawing conclusions about the alleged similarities of Plaintiff's and Defendant's services, Franklyn admitted that he lacked an understanding as to what Defendant's advertising-related services even were or what advertising-related services Defendant offers. Ex. 61 at 256:18-257:3, 257:17-21. Where (as here) there is too great a gap between the data and the opinion,

17

the opinion should be excluded. *See In re Accutane Prods. Liab.*, 511 F. Supp. 2d 1288, 1303 (M.D. Fla. 2007).

Further, at least one of the sources that Franklyn cites as alleged support for this opinion actually undermines his claim of overlapping services. For example, he notes that advertisers are withdrawing from Defendant's platform and that it has been recommended that law firms stop advertising there. Ex. 72 at 33. But the webpage Franklyn cited reveals no such recommendations. *See* Ex. 76. Rather, the webpage simply shows a comparison of follower counts across social media platforms for several top law firms with accounts. Similarly, the webpage Franklyn cites shows firms use X "as a communications platform," not for the lead-generation advertising agency services that Plaintiff provides. *Id.* The webpage further details a law firm's explanation that "managing accounts on the [X] platform" is difficult because it "doesn't generate any business," further demonstrating the lack of overlap (since lead-generation is Plaintiff's entire business model). *Id.* Franklyn conceded that the sources he relied on for this opinion did not contain marketing principles or methodologies, and explained he "didn't feel the need to do that in this case." Ex. 61 at 230:11-25.

An opinion with an inadequate and contradictory factual basis, and no cited methodology, fails to meet the "intellectual rigor" *Daubert* requires. *Kumho Tire Co.*, 526 U.S. at 152. The Overlapping Services Opinion should be excluded. *See McDowell*, 392 F.3d at 1300; *see also Joiner*, 522 U.S. at 146.

> **B.    The Court Should Exclude the "WeChat Opinion" (Sec. VII-2; Sec. VIII-2).**

To support his opinion that Plaintiff and Defendant do not operate in the same product category, Golder relied on the parties' webpages, financial statements, analyst reports, and responses to interrogatories, opining that Defendant and Plaintiff are not competitors (as Defendant listed competitors such as Meta, Snapchat, and TikTok, while Plaintiff listed competitors such as Demand Lane and Case Legal Media). Ex. 70 at ¶¶ 32-36; *see also id.* at n.94. Golder further opined that Defendant's competitors similarly do not identify Plaintiff as a competitor. Ex. 70 at ¶ 34, n.97.

Franklyn attempts to rebut this opinion with unsupported speculation, namely that (i) a company called WeChat is a competitor of X Corp., (ii) WeChat's services are similar to those of Plaintiff, and therefore (iii) Plaintiff and X Corp. must also be competitors (implying that their products overlap). Ex. 72 at 39. No marketing principles or methodology support Franklyn's reasoning, and he again does not explain the facts or data underlying this conclusion. *See Rink*, 400 F.3d at 1292 (stating that a "scientifically unsupported leap of faith [] is condemned by *Daubert*").

When asked what marketing principles he relied on, Franklyn stated that he simply "used th[e] principle of looking at competitors," colloquially calling it "marketing 101." Ex. 61 at 259:24-260:17. Unlike Golder, he cited no authority or marketing principles to guide how to identify competitors, what aspects to consider, or how to analyze them. There is no evidence that Franklyn used any established methodology.

But even if Franklyn had used a methodology, his opinion rests on unsupported assumptions and insufficient facts. To support his claim that WeChat offers similar

services to Plaintiff, Franklyn points to "Tencent Marketing Solution," an advertising service offered by WeChat's parent company, *not WeChat itself*. Ex. 72 at 40. Franklyn fails to identify any WeChat service that is actually similar to Plaintiff's offerings. Even if WeChat offered advertising services similar to Plaintiffs, that alone would not mean that *X Corp.* offers, or competes with, those same services. In any event, there is no evidence that "Tencent Marketing Solution" is used for lead generation in the mass tort industry, which is Plaintiff's niche. Franklyn himself concedes that "X Social Media is so far, to date, mostly focused on personal injury and mass tort lawyers. And that itself puts it in a bit of a niche." Ex. 61 at 262:9-20.

Franklyn's failure to identify any WeChat service similar to Plaintiff's is unsurprising, as Plaintiff does not consider WeChat to be a competitor or even a company that offers substantially similar services to Plaintiff. *See* Ex. 16, No. 10. Franklyn had access to Plaintiff's discovery responses but did not review them, admitting that he did not consider whether Plaintiff views WeChat as a competitor and took no steps to research this. Ex. 61 at 262:9-263:2, 264:16-19.

Franklyn's opinions regarding WeChat are conclusory, lack any explanation of methodology or authoritative support, contradict available facts, and are based on subjective beliefs and speculation without adequate research. Such unsupported opinions should be excluded. *See McClain*, 401 F.3d at 1244-45; *see also* Fed. R. Evid. 702.

    **C.    The Court Should Exclude the "Secondary Consumer Opinion" (Sec. VII-3; Sec. VIII-3).**

Relying on marketing journals and authority, well-known marketing models and documentary evidence detailing the purchase process for Plaintiff's clients, Golder opined that Plaintiff's consumers are likely to be highly involved in the buying process, thus lessening any likelihood of confusion. Ex. 70 at ¶¶ 44-52. Franklyn argues that this analysis "ignores the secondary consumers who view X Social Media advertising." Ex. 72 at 40. Franklyn's opinion again lacks sufficient facts, data, and any reliable, testable methodology and should be excluded for the same reasons as Franklyn's Underinclusive Universe Opinion. *See supra* Section I.

Franklyn claims that Golder failed to consider how reverse confusion might affect potential customers of X Social Media's clients—ordinary consumers seeking legal services. Ex. 72 at 40-41. Franklyn cites no support for this critique. As explained above, these "secondary" consumers are irrelevant because they are not consumers of Plaintiff's services, and the Facebook advertisements they see do not display Plaintiff's name or logo. Ex. 7 at 124:11-22; Ex. 4 at 149:9-20. Plaintiff uses a different brand, RightChoice Legal, to market to these consumers. Ex. 7 at 125:1-8.

Franklyn's assertions directly contradict the evidence and fail to satisfy Rule 702's requirements. *See Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1203 (11th Cir. 2010) (affirming the exclusion of expert testimony where "there was too great an analytical gap between [the expert's] evidence and conclusions"); *see also McDowell*, 392 F.3d at 1300 ("[A]n expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions."). Franklyn admitted that he did not cite any document or advertisement as part of this

21

critique. Ex. 61 at 269:1-4. He also conceded that the secondary consumers at issue would not be seeking Plaintiff's advertising services. Ex. 61 at 267:19-22. Franklyn further admitted he did not know where the advertisements he purported to rely on appeared or how they were used. Ex. 61 at 41:14-23, 43:15-25. He acknowledged that the ads he described did not target potential class action plaintiffs. Ex. 61 at 42:23-43:11. Instead of conducting an independent analysis, Franklyn relied solely on advertisements Plaintiff's counsel provided (which included a few explanatory sentences from Plaintiff's counsel). Ex. 61 at 44:4-8. Relying on counsel's representations, without independent investigation, violates Rule 702. *See DW ex rel. CW v. Carnival Corp.*, No. 17-20115-CIV, 2018 WL 7822329, at *4 (S.D. Fla. June 19, 2018) (stating that an expert is unreliable "where . . . opinions are based entirely on anecdotal experience and [] review of materials provided to him by Plaintiff's counsel.") (citing *Umana-Fowler v. NCL (Bahamas) Ltd.*, 49 F. Supp. 3d 1120, 1122 (S.D. Fla. 2014)).

Franklyn also speculates that "secondary consumers" might associate X Social Media with X Corp. and avoid joining class actions due to a dislike of X Corp. or Elon Musk. Ex. 72 at 41. He provides no support for these speculative conclusions, falling short of the "intellectual" rigor Rule 702 requires. *See Frazier*, 387 F.3d at 1260; *see also Kumho Tire Co.*, 526 U.S. at 152.

    **D.    The Court Should Exclude the "Alternate Scenario Opinion" (Sec. VII-4; Sec. VIII-4).**

Relying on leading authority, the Golder Report sets out two possible scenarios in which reverse confusion *could* occur in this case, but ultimately concludes that "the sophisticated, high-involvement consumers in this matter are particularly likely to distinguish between these two brands." Ex. 70 at ¶ 56. In rebuttal, Franklyn offers an "alternative example clearly show[ing] how reverse confusion could occur outside of the parameters described by Golder," which he described at his deposition as "initial interest confusion." Ex. 72 at 42; Ex. 61 at 273:2-8.

As an initial matter, this opinion should be excluded under the Court's prior Order on Defendant's Motion to Strike. *See* Doc. 70. The Court struck portions of the Franklyn Report as "untimely affirmative opinions," specifically noting that "initial-interest confusion" was not addressed by Defendant's experts and was improperly introduced by Franklyn. *Id.* at 6. As such, it is not a proper rebuttal under the Court's prior ruling and should be excluded.

Further, despite Franklyn's criticism that Golder "misses" this scenario, it is exactly what Golder described as a possible scenario of reverse confusion, which he then discussed at length in the context of the marketing principles he applied. Specifically, Franklyn describes the "missed" scenario as involving a consumer search for Plaintiff's services, seeing Plaintiff's logo, associating it with X Corp., and deciding to not purchase Plaintiff's services. Ex. 72 at 43. However, Golder explicitly explained that his analysis accounts for a consumer who is "dissuaded from completing their purchase journey with [Plaintiff] because an encounter with [Plaintiff]'s consumer-facing market presence makes them believe that [Plaintiff] is associated with X Corp."

23

*See* Ex. 70 at ¶ 54 (Scenario (ii)). The Golder report itself directly contradicts Franklyn's opinion that this scenario was "missed."

In any event, the opinion is independently inadmissible because it lacks sufficient facts, data and any reliable, testable methodology. *See McClain*, 401 F.3d at 1240 (excluding an expert's testimony due to its "speculative conclusions" drawn from "questionable principles"); *see also* Rule 702(a). Franklyn's use of Google search results is also inconsistent with academic literature, including his own prior work. *See* Ex. 77. In a published study, Franklyn found "little evidence of traditional actionable consumer confusion regarding the source of goods" from the search engine results of 2,500 trademarks, and concluded that the "aggregate risk of consumer confusion [was] low." *Id.* at 4. He further explained that the confusion observed did not align with the types recognized by U.S. trademark law. *Id.* at 4, 64. Even by Franklyn's own standards, the "confusion" he posits here is not actionable trademark confusion.

Franklyn further fails to cite any methodology or authority for the assertion that a consumer might see a search result, associate it with X Corp., and decide against using Plaintiff's services. Ex. 72 at 43. Courts do not accept such conclusory opinions without factual or analytical support. *Cook*, 402 F.3d at 1113 (11th Cir. 2005) ("Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough."). Actual evidence does not support Franklyn's conclusory statement that "clear evidence" exists. Ex. 61 at 276:9-17. His opinion is thus speculative and insufficient under Rule 702. *See McClain*, 401 F.3d at 1245.

## CONCLUSION

For the foregoing reasons, Defendant X Corp. respectfully requests that this Court exclude the Franklyn Rebuttal Opinions (contained in Sections IV-5, V-5, VII, and VIII of the Franklyn Report) pursuant to *Daubert* and Rule 702.

## LOCAL RULE 3.01(g) CERTIFICATION

On June 3, 2025, counsel for the Parties conferred on the issues raised in this motion by videoconference. Plaintiff opposes the relief sought herein.

|  |  |
|---|---|
| Dustin Mauser-Claassen | /s/ *Megan K. Bannigan* |
| Florida Bar No. 0119289 | Megan K. Bannigan (Lead Counsel)* |
| Quinn B. Ritter | David H. Bernstein* |
| Florida Bar No. 1018135 | Jared I. Kagan* |
| KING, BLACKWELL, ZEHNDER, | Nicole M. Flores* |
| & WERMUTH, P.A. | Debevoise & Plimpton LLP |
| 25 E. Pine St. | 66 Hudson Blvd |
| Orlando, FL 32801 | New York, NY 10001 |
| Telephone: (407) 422-2472 | Telephone: (212) 909-6000 |
| dmauser@kbzwlaw.com | mkbannigan@debevoise.com |
| qritter@kbzwlaw.com | dhbernstein@debevoise.com |
|  | jikagan@debevoise.com |
|  | nmflores@debevoise.com |
|  | *Admitted pro hac vice* |

*Counsel for Defendant, X Corp.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that, on June 4, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ *Dustin Mauser-Claassen*
Dustin Mauser-Claassen
Florida Bar No.: 0119289