## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

X SOCIAL MEDIA LLC,

        **Plaintiff,**

v.                            **Case No. 6:23-cv-1903-JA-NWH**

X CORP.,

        **Defendant.**

_____

### ORDER

This case is before the Court on the parties' *Daubert*[1] motions (Docs. 82 & 88[2]), their responses in opposition (Docs. 99 & 104), and their replies (Docs. 121 & 123).[3] Based on the Court's review of the parties' submissions, Plaintiff's motion must be denied and Defendant's motion must be granted.

## I. BACKGROUND

This trademark action involves alleged reverse confusion of Plaintiff's senior, but less widely known, X SOCIALMEDIA mark with Defendant's junior,

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

[2] Defendant filed an initial *Daubert* motion (Doc. 84) and then filed a corrected motion (Doc. 88) to include a certificate of conferral pursuant to Local Rule 3.01(g). The Court refers only to Defendant's corrected *Daubert* motion (Doc. 88) and will deny the initial motion (Doc. 84) as moot.

[3] The Court permitted the parties to file reply briefs in support of their *Daubert* motions. (*See* orders, Docs. 108 & 110).

but more widely recognized, "X" mark. Plaintiff operates an advertising agency that designs and runs social-media advertising campaigns for mass-tort and class-action law firms. (Doc. 82 at 6). Plaintiff owns a federal trademark registration for the mark X SOCIALMEDIA, which Plaintiff began using in 2015.[4] (Doc. 85-14 at 2; Doc. 85-35 at 2; Doc. 85-52 at 2; Doc. 104 at 5). Defendant operates X—formerly known as Twitter—an online and app-based social-media platform that allows users to create and share a wide range of digital content, including advertisements. (Doc. 85-1 at 19:21–24; Doc. 85-6 at 58:8–14; Doc. 85-11 at 10; Doc. 85-19). Following an acquisition in 2022, Defendant rebranded the platform as "X," a change attributed to its chief technology officer's longstanding sentimental attachment to the letter "X." (Doc. 85-1 at 70:10–24).

In August 2023, Defendant received a cease-and-desist letter from Plaintiff objecting to Defendant's use of the "X" mark. (Doc. 85-1 at 42:3–7; Doc. 85-11 at 21–22). Plaintiff then filed this action under the Lanham Act, 15 U.S.C. §§ 1114, 1125, alleging that Defendant's 2023 rebrand is likely to cause reverse confusion—that is, to lead consumers to believe Plaintiff is affiliated with or sponsored by Defendant—and that consumers will forgo engaging Plaintiff's services as a result. (*See generally* Doc. 1 at 9–11; Doc. 82 at 2, 6; Doc. 104 at 2–

---

[4] U.S. Trademark Registration No. 5,554,203 (Sept. 4, 2018). (Doc. 85-71 at C-7).

2

3). Plaintiff also asserts claims under Florida law for unfair competition and trademark and service mark infringement.[5] (Doc. 1 at 11–14).

Both parties retained experts to advance their respective theories of the case. (*See* Docs. 85-71, 85-72, & 85-73). Defendant offers (1) marketing scholar Peter Golder and (2) survey practitioner Hal Poret. (Doc. 85-71 at 2–3; Doc. 85-72 at 2–3). Professor Golder analyzes the product markets in which the parties operate and opines that reverse confusion is improbable. (Doc. 85-71 at 5–9, 41–42). Mr. Poret conducted an Eveready[6] consumer-perception survey to test for the likelihood of reverse confusion and found minimal confusion. (Doc. 85-72 at 5–7, 61). Plaintiff offers Professor David J. Franklyn, a trademark-law scholar, to rebut both Professor Golder and Mr. Poret. (Doc. 85-73 at 1–3). Professor Franklyn disputes Professor Golder's market-structure analysis and critiques Mr. Poret for limiting his survey universe to representatives of law firms and advertising agencies, contending that Mr. Poret should also have surveyed the consumers who view Plaintiff's ads on social media. (Doc. 85-73 at 10–11, 29–30). Both parties move to exclude aspects of the opposing experts' opinions under *Daubert* and Federal Rule of Evidence 702. (Doc. 82 at 1; Doc. 88 at 1).

---

[5] The Court previously dismissed Plaintiff's claim under the Florida Deceptive and Unfair Trade Practices Act. (*See* Doc. 41 at 7–9).

[6] The "Eveready" survey is named after the survey endorsed by the Seventh Circuit in *Union Carbide v. Ever-Ready, Inc.*, 531 F.2d 366, 385 (7th Cir. 1976).

## II.    LEGAL STANDARDS

Federal Rule of Evidence 702 governs the admissibility of expert opinions and "compels" the Court "to perform [a] critical 'gatekeeping' function." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting *Daubert*, 509 U.S. at 589 n.7). This gatekeeping obligation "applies to all expert testimony," not just "scientific" evidence. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Under Rule 702, a qualified expert may testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The party offering the expert has the burden of satisfying each of these . . . elements by a preponderance of the evidence." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005) (citing *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999)).

Because this is a bench trial, (*see* Doc. 36), the traditional *Daubert* analysis may be somewhat "relaxed" because "[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005). Nevertheless, Rule 702 still requires district courts to exclude unreliable or unhelpful expert testimony, even in a bench trial. *See Ass Armor, LLC v. Under*

4

*Armour, Inc.*, No. 15-CV-20853-CIV, 2016 WL 7156092, at *4 (S.D. Fla. Dec. 8, 2016).

## III.    DISCUSSION

The Court discusses the challenged opinions of Professor Golder, Mr. Poret, and Professor Franklyn in turn.

### A.    Professor Peter Golder

Defendant retained Professor Golder to analyze the structure of the parties' product markets, the sophistication of Plaintiff's consumers, and the nature of Plaintiff's sales process and to "[d]iscuss whether [these] assessments" are "consistent or inconsistent with Plaintiff's theory of reverse confusion." (Doc. 85-71 at 6). Plaintiff moves to exclude Professor Golder under Rules 702 and 403, contending that he is unqualified, offers improper legal conclusions, ignores the Eleventh Circuit pattern jury instructions for trademark-infringement cases, disregards evidence of actual confusion, relies on irrelevant third-party marks, and "cherry-pick[s]" facts. (Doc. 82 at 5–6, 8, 12, 15).

### 1.    *Summary of Professor Golder's Opinions*

Professor Golder opines that similar brand names can coexist without consumer confusion when they operate in distinct 'product categories,' which he illustrates with third-party examples such as "Delta"—the brand-name of an airline, a faucet company, and a dental insurer. (Doc. 85-71 at 7, 11, 15). He opines that Plaintiff and Defendant "operate in different product categories"

5

because Plaintiff is a "Facebook advertising agency that specializes in running campaigns for law firms" and Defendant, by contrast, "operate[s] a social media platform" that allows users to share "short text messages or video/audio clips," (*id.* at 22), and "generates revenue by allowing advertisers to place ads on its platform," (*id.* at 11, 23, 28–29, 32–34, 38–41). He further notes that Defendant's public SEC filings identify technology companies such as Meta, Alphabet, Microsoft, and TikTok—not advertising agencies like Plaintiff—as competitors.[7] (*Id.* at 25–26).

Professor Golder further opines that Plaintiff's customers—lawyers and law firms—are sophisticated consumers who make purchasing decisions based on "diligent, rational consideration of the most important product information." (*Id.* at 29 (quoting Philip Kotler and Kevin Lane Keller, *Marketing Management* 180 (15th ed. 2016))). He notes their high level of education, the high cost of Plaintiff's services ("tens of thousands of dollars or more"), and Plaintiff's "high touch" sales process involving direct interaction with Plaintiff's CEO—all of which provide opportunities for consumers to distinguish Plaintiff from Defendant. (*Id.* at 33–36).

Finally, Professor Golder explains that reverse confusion in this case would require consumers either to complete their purchase journey with

---

[7] The SEC filings Professor Golder relied on were filed in 2022 by Twitter, Inc., Defendant's precursor company. (*See* Doc. 85-71 at 25 n.94).

Plaintiff while mistakenly believing it is sponsored by Defendant or to forgo Plaintiff's services due to a mistaken belief in such an association. (*Id.* at 36 (citing Shari Seidman Diamond & Jerre B. Swann, *Trademark and Deceptive Advertising Surveys: Law, Science, and Design* (2012))). He opines that Plaintiff's theory of reverse confusion is "inconsistent with both the documentary record and marketing literature" given the parties' distinct product categories, the sophistication of Plaintiff's customers, and the nature of Plaintiff's sales process. (*Id.* at 41–42).

### 2.    *Plaintiff's* Daubert *Challenges to Professor Golder*

Plaintiff first argues that Professor Golder is "not qualified as a trademark law expert" because he is neither a "trademark attorney [n]or former-USPTO commissioner." (Doc. 82 at 5–6, 15; Doc. 123 at 3). Rule 702, however, requires only that an expert be qualified "by knowledge, skill, experience, training, or education" to testify competently "regarding the matters he intends to address." *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert*, 509 U.S. at 589). Nothing in Rule 702 demands experts to have legal credentials. *See id.* at 563–65 (rejecting a narrow view of expert qualification where testimony was within the expert's specialized discipline). Defendant has proffered Professor Golder as a marketing expert, not a legal expert. (*See* Doc. 85-71 at 6). His background includes a Ph.D. in marketing, decades of academic appointments in marketing, and prior

7

experience providing expert marketing testimony in litigation. (Doc. 85-71 at 1–2). Plaintiff does not challenge those credentials. Evaluated in his proffered field, the Court finds him qualified under Rule 702.

Plaintiff next contends that Professor Golder impermissibly offers legal conclusions, citing his statement that "Plaintiff's theory of reverse confusion is not consistent with the documentary evidence in this matter or with the marketing literature." (Doc. 85-71 at 8, 41). Plaintiff argues that Professor Golder improperly "attempts to reframe confusion as a marketing concept" in a manner "inconsistent with the factfinder's job." (Doc. 124 at 6). "An expert may not . . . merely tell the jury what result to reach" or state pure legal conclusions. *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990); *see also Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1128–29 (11th Cir. 2018). But at the same time, expert testimony "is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). Considered in context, the challenged statements are tied to marketing concepts and record evidence, and Professor Golder expressly disclaimed offering a "legal opinion on confusion." (Doc. 85-71 at 6 n.6). Plaintiff's argument is rejected. *See Frazier*, 387 F.3d at 1262–63.

Plaintiff further argues that Professor Golder's opinions are irrelevant because he "ignores" Eleventh Circuit jury instructions on "related goods" or the "source or sponsorship" test. (Doc. 82 at 7 (citing *Planetary Motion, Inc. v.*

*Techsplosion, Inc.*, 261 F.3d 1188, 1201 (11th Cir. 2001))). But Rule 702 does not require an expert to cite legal standards for opinions to be admissible. *See Harcros Chems., Inc.*, 158 F.3d at 564–65. Whether Professor Golder's framing is persuasive is a matter for "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," not exclusion. *Daubert*, 509 U.S. at 596.

Plaintiff also seeks exclusion because Professor Golder did not consider evidence of actual confusion. (Doc. 82 at 9 (citing Doc. 85-71 at 6 n.16)). Plaintiff argues this omission may "change the jury's expectations" when applying the instructions at trial. (Doc. 82 at 9). But this matter is set for a bench trial, where concerns about the "jury's expectations" carry no weight. *See Perez v. United States*, No. 8:20-cv-769-SPF, 2021 WL 3371498, at *2 (M.D. Fla. Aug. 3, 2021) (explaining that in a bench trial "it is presumed the trial judge will disregard inadmissible evidence and rely only on competent evidence" (citing *Singh v. Caribbean Airlines Ltd.*, No. 13-20639-CIV, 2014 WL 4101544, at *1 (S.D. Fla. Jan. 28, 2014))). In any event, the "failure to include variables will affect the analysis' probativeness, not its admissibility." *Quiet Tech.*, 326 F.3d at 1345 (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)). The Court will evaluate evidence of actual confusion independently and consider Professor Golder's testimony only for its permissible purpose.

Plaintiff next challenges as "irrelevant and misleading" Professor Golder's reliance on third-party brand examples such as Delta, Dove, Morningstar, Pandora, and Tiffany. (Doc. 82 at 13–14 (citing Doc. 85-71 at 7, 13–15)). Plaintiff argues these examples are unhelpful because "[w]e don't even know" whether the companies behind those marks have pursued enforcement actions or entered sponsorship or coexistence agreements. (*Id.* at 14). Plaintiff analogizes to *ITT Corp. v. Xylem Group, LLC*, where expert testimony about hypothetical coexistence was excluded. 963 F. Supp. 2d 1309, 1333–34 (N.D. Ga. 2013). But the analogy is misplaced. The expert in *ITT Corp.* speculated about valuation of hypothetical agreements, whereas Professor Golder uses actual marketplace examples to illustrate how consumers differentiate similar brand names across product markets. *See id.* at 1334. To the extent Professor Golder's examples do not correspond perfectly to this case, "objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)); *see also Quiet Tech.*, 326 F.3d at 1345.

Finally, Plaintiff argues Professor Golder "cherry-picked" evidence by declining to evaluate evidence of actual confusion and by emphasizing factors favorable to Defendant. (Doc. 82 at 15–16). But such criticisms ordinarily go to weight, not admissibility, absent methodological unreliability. *See Quiet Tech.*,

10

326 F.3d at 1345. Here, Professor Golder disclosed the materials he considered and applied recognized marketing principles to the facts of this case. (*See* Doc. 85-71 at C-1 to C-7). Plaintiff's cherry-picking objection does not establish unreliability under Rule 702 and is overruled.

### B.    Hal Poret

Defendant retained Hal Poret, a consumer-survey expert, "to design and conduct a scientific survey" assessing whether "Defendant's use of its X mark creates a likelihood of reverse confusion with Plaintiff." (Doc. 85-72 at 3, 5). Mr. Poret did so and concluded that "Defendant's use of its X mark does not create a likelihood of confusion with Plaintiff." (*Id.* at 3). Plaintiff moves to exclude his testimony, contending that his survey is unreliable because: (1) it lacked a control group; (2) it used the Eveready format rather than Squirt[8] (3) it relied on flawed coding assumptions; and (4) it tested an underinclusive universe. (Doc. 82 at 17, 19, 21, 24).

### 1.    *Summary of Mr. Poret's Opinions*

Mr. Poret conducted an Eveready survey, in which respondents are shown only the senior user's mark (here, Plaintiff's "X SocialMedia") and asked questions to assess whether the respondents associate that mark with the junior

---

[8] The "Squirt" survey is named after the survey endorsed by the Eighth Circuit in *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980).

user's mark (here, Defendant's "X"). (Doc. 85-72 at 6). The Eveready format is often used when the junior user's mark is "top-of-mind"—that is, so well-known that consumers may recall it without being shown it. *See* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:174 (5th ed. 2024). Mr. Poret described the Eveready format as a "highly standard and well-accepted survey format" that is "ideal for assessing reverse confusion." (*Id.*).

Mr. Poret administered the survey online to 200 respondents who had been screened to ensure they worked for law firms or marketing firms that had used or planned to use social media advertising services—the population he identified as Plaintiff's customer base. (*Id.* at 6, 37–48). Each respondent viewed four pages from Plaintiff's website for at least fifteen seconds each, giving respondents "numerous significant exposures to the use of the X SOCIALMEDIA mark as it would be experienced in the marketplace." (*Id.* at 30). Respondents then answered survey questions including: who they believed offered the services on the website; whether they had previously heard of that company; whether they associated the website with any other products or services; and whether they thought the website was affiliated with or sponsored by another company. (*Id.* at 30–33).

According to Mr. Poret, only 4.0% of respondents provided answers that "suggest[] reverse confusion" between Plaintiff and Defendant. (Doc. 85-72 at 36). Mr. Poret characterized this as "typical survey noise" reflecting "guessing

or speculation that is not attributable to any trademark similarity." (*Id.* at 3, 61). He concluded that "Defendant's use of its 'X' mark does not create a likelihood of reverse confusion with Plaintiff." (*Id.* at 61).

### 2.    *Plaintiff's* Daubert *Challenges to Mr. Poret*

Plaintiff first argues that Mr. Poret's survey is unreliable because it lacked a control group. (Doc. 82 at 17–19). Plaintiff argues that without a control, the survey cannot distinguish between genuine confusion and background "noise," citing authorities cautioning that surveys without controls may have less probative value. *See, e.g., Superior Consulting Servs., Inc. v. Shaklee Corp.*, Case No. 6:16-cv-2001-Orl-31GJK, 2018 WL 2087239, at *4 (M.D. Fla. May 4, 2018) (noting that the lack of a control "undermines the reliability of the [expert's] survey"); McCarthy, *supra*, § 32:187 (explaining that "a survey that fails to use a control may be given less weight or even excluded"). Mr. Poret acknowledged the omission but explained that controls are most useful where the initial confusion rate is high enough that noise could materially affect the result. (Doc. 85-72 at 34). Here, however, "[t]he [t]est [g]roup rate of confusion was already so low that it shows a lack of confusion even without taking any potential noise into consideration." (*Id.* at 3, 35–36).

The absence of a control group does not render a survey inadmissible under Rule 702. The Eleventh Circuit distinguishes between flaws that "impugn the accuracy of [an expert's] results" and flaws that "call into question the

general scientific validity" of the method; the former go to weight and are tested by cross-examination. *Quiet Tech.*, 326 F.3d at 1345–46; *Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 844 (11th Cir. 1983) (explaining that "alleged technical deficiencies affect the survey's weight, however, and not its admissibility"). Courts in the Eleventh Circuit have admitted surveys lacking controls. *See Vital Pharms., Inc. v. Monster Energy Co.*, 553 F. Supp. 3d 1180, 1272–74 (S.D. Fla. 2021). Mr. Poret's rationale for omitting a control is sufficiently reliable under Rule 702; any shortcoming bears on weight, not admissibility. *See Rosenfeld*, 654 F.3d at 1193.

Plaintiff next challenges Mr. Poret's use of the Eveready format, arguing it is inappropriate here because it presumes that Defendant's mark is top-of-mind. (Doc. 82 at 19–20). Plaintiff argues that Defendant's mark is not top-of-mind and that given the "proximity of the parties' services to each other," only a Squirt survey, which presents both marks side-by-side, could capture the likelihood of confusion that may occur when both parties' marks are featured in online search results. (Doc. 82 at 19–20 (citing Doc. 85-62 at 79:15-93:18, 121:5-130:22, 141:10-148:15, 153:17-155:2, 156:7-160:22, & 165:22-170:14; Doc. 85-73 at 14–19)).

The dispute over whether Eveready or Squirt is more probative here is for the trier of fact to decide; it does not implicate methodological reliability under Rule 702. *See* McCarthy, *supra*, § 32:174 (noting that "the courts have rejected"

14

the argument that an Eveready survey is only appropriate where the senior mark is "'top-of-mind'"); *WIZKIDS/NECA, LLC v. TIII Ventures, LLC*, No. 17-CV-2400, 2019 WL 1454666, at *12 (S.D.N.Y. Mar. 31, 2019) ("[Plaintiff] cites no case, and the Court has found none, in which an Ever[]eady survey was excluded on the grounds that the mark being tested was not so strong as to be considered a 'top-of-mind' mark."); *Casa Tradicion S.A. de C.V. v. Casa Azul Spirits, LLC*, No. 22-CV-H-2972, 2023 WL 7284182, at *5 (S.D. Tex. Nov. 3, 2023) (admitting Eveready survey despite arguments that senior mark lacked top-of-mind awareness). Both Eveready and Squirt formats are accepted in the industry, and thus Mr. Poret's survey will not be excluded merely because Plaintiff believes a Squirt survey would be more probative. *See Jellibeans*, 716 F.2d at 845; *Quiet Tech.*, 326 F.3d at 1345–46.

Plaintiff also argues Mr. Poret's coding decisions artificially lowered the measured confusion rate. Specifically, Plaintiff points to his: (1) treatment of forty-one respondents who identified "XSocial," "X Social Media," or "XSocialMedia" as the source of the webpages as not confused, on the assumption that the respondents intended to identify Plaintiff rather than Defendant; (2) exclusion of six respondents who answered that "X" was responsible for the pages but denied prior familiarity with the company because Mr. Poret believed they merely "parrot[ed] back part of the name they saw on the webpage"; and (3) disregarding a respondent who identified "Vine"—a

defunct video platform owned by Twitter—as a related service. (Doc. 82 at 21–24; Doc. 85-72 at 30–32). Plaintiff contends that recording these responses would yield a 23.5% confusion rate. (Doc. 82 at 24).

But Plaintiff's objections boil down to the assertion that Mr. Poret misused a survey method that "in the abstract, is reliable." *Quiet Tech.*, 326 F.3d at 1345. Plaintiff's argument that the references by respondents to "X Social Media" (or to variants thereof) are inherently ambiguous and could denote Defendant's mark "are of a character that impugn the accuracy of [the expert's] results, not the general scientific validity of [the expert's] methods." *Id.* It is well-established that "[t]he identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination." *Id.* (citing *Daubert*, 509 U.S. at 596). Plaintiff's objection must therefore be overruled.

Finally, Plaintiff argues the survey universe was underinclusive because it did not include consumers who merely view Plaintiff's ads on Facebook and instead exclusively sampled representatives of legal and marketing firms. (Doc. 82 at 24–25; Doc. 85-72 at 6). However, when assessing reverse confusion, limiting the universe to the senior user's customers is a generally accepted approach. *See* McCarthy, *supra*, § 32:159. In any event, universe selection normally "should be dealt with by cross-examination, not exclusion." *Superior Consulting*, 2018 WL 2087239, at *5; *Jellibeans*, 716 F.2d at 845.

16

## C.    Professor David J. Franklyn

Plaintiff retained Professor David J. Franklyn, a law professor at Arizona

State University's Sandra Day O'Connor College of Law and Executive Director

of the McCarthy Institute, to rebut the reports of Professor Golder and Mr.

Poret.[9] (Doc. 85-73 at 6). The McCarthy Institute studies "trademark law,

branding and consumer perceptions related to brands." (*Id.* at 7). Between 2018

and 2021, Professor Franklyn also held a joint appointment at Golden Gate

University's law school and business school. (*Id.*).

Defendant moves to exclude two categories of Professor Franklyn's

opinions: (1) all of his critiques of Professor Golder, on the grounds that

Professor Franklyn is not qualified to offer marketing opinions and, in any

event, his critiques lack reliable methods and sufficient factual support, (Doc.

88 at 6, 11 (citing Doc. 85-73 at 25)); and (2) his opinion that Mr. Poret's survey

used an underinclusive universe, (Doc. 88 at 6 (citing Doc. 85-73 at 25)).

### 1.    Summary of Professor Franklyn's Opinions

#### a.    Critiques of Professor Golder

Professor Franklyn disputes Professor Golder's claim that the parties

operate in distinct product categories, opining that the parties "operate in highly

---

[9] Plaintiff also retained Professor Franklyn to offer his "affirmative opinions" based on his own likelihood-of-confusion surveys, (*see* Doc. 85-73 at 6, 45–92), but the Court struck these opinions as untimely, (*see* Doc. 70 & 105).

17

overlapping product categories and often provide nearly identical services."
(Doc. 85-73 at 29). He criticizes Professor Golder's reliance on third-party brand
analogies such as "Delta," contending that those examples are inapposite
because here "the product category of [Defendant] is the brand name of
[Plaintiff]." (*Id.*). He further contends that both parties' marketing references to
advertising and social media "suggest the two companies operate in related
product categories," and he points to Defendant's announced plan to develop X
into an "everything app" as likely to erase any categorical boundaries between
the parties' services. (*Id.* at 30). He asserts that the parties are competitors and
draws a comparison between Defendant and the social media service WeChat.
(*Id.* at 39–40). He opines that negative media coverage about Defendant and its
leadership will reduce the effectiveness of Plaintiff's campaigns. (*Id.* at 41–42).
Finally, he posits that Professor Golder overlooked an "alternate scenario" of
reverse-confusion in which prospective customers seeking Facebook advertising
services disengage Plaintiff because they misperceive Plaintiff as affiliated with
Defendant. (*Id.* at 42–43).

### b.    Critiques of Mr. Poret

Professor Franklyn criticizes Mr. Poret's reverse-confusion survey for,
among other things, using an "underinclusive universe" that "fails to account
for consumers" who encounter the advertisements Plaintiff creates for its law-
firm clients. (Doc. 85-73 at 25). Mr. Poret surveyed only "representatives of legal

18

practices and advertising/marketing firm[s]," (Doc. 85-73 at 6), and Professor

Franklyn opines that the perceptions of consumers exposed to Plaintiff's ads

may negatively influence the "viability of the advertising services being

provided by [Plaintiff]," (*id.*).

> 2.    *Defendant's* Daubert *Challenge to Professor Franklyn's
> Critiques of Professor Golder*

Defendant first argues that Professor Franklyn is unqualified to rebut

Professor Golder. (Doc. 88 at 11). Professor Franklyn considers himself an

expert in "marketing as it relates to trademark law." (Doc. 85-62 at 100:1–6).

But his academic training is in history, philosophy, religion, and law, and his

curriculum vitae identifies no degrees, work experience, or professional

memberships in marketing or advertising disciplines. (*Id.* at 114:17–115:8; Doc.

85-74). Although he once held a "Business, Marketing and Advertising"

professorship, his courses focused on branding as a legal concept and survey

design. (Doc. 85-62 at 112:7–113:17)). They did not address marketing science.

(*Id.*). He has never practiced marketing, has never attended a marketing

conference, and did not review the literature on which Professor Golder relied.

(*Id.* at 215:23–216:6, 219:10–25).

Plaintiff points to out-of-circuit decisions admitting Professor Franklyn on

consumer perception issues. *See Roblox Corp. v. WowWee Grp. Ltd.*, No. 22-cv-

04476, 2024 WL 4057418, at *9–10 (N.D. Cal. Sept. 3, 2024); *GeigTech E. Bay*

*LLC v. Lutron Elecs. Co.*, No. 18-cv-05290, 2023 WL 6614486, at *10 (S.D.N.Y. Sept. 20, 2023). But those cases did not involve the marketing frameworks underlying Professor Golder's report. The Eleventh Circuit requires that a witness relying on experience "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Augustin*, 661 F.3d 1105, 1125 (11th Cir. 2011) (quoting *Frazier*, 387 F.3d at 1260). On this record, Plaintiff has not carried its burden to show Professor Franklyn is qualified to opine on marketing science.

Plaintiff argues that the "crux of [Professor] Golder's opinion" is his "evaluati[on] [of] likelihood of confusion," a topic with which Professor Franklyn "has decades of experience," and points to his ability to cite USPTO product-classification guidance. (Doc. 104 at 8). But Plaintiff does not identify which of Professor Golder's opinions fall outside marketing science, nor does Plaintiff explain how Professor Franklyn's experience qualifies him to apply USPTO categorization standards in this case. Accordingly, the Court concludes that Plaintiff has not met its burden under Rule 702 to establish that Professor Franklyn is qualified to rebut Professor Golder's marketing opinions.

Setting aside his qualifications, Professor Franklyn's critiques of Professor Golder fail under Rule 702 because they are not based on reliable principles and methods. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

His report asserts that the parties' categories overlap and that Defendant's "everything app" plans may collapse category boundaries, (Doc. 85-73 at 30–31, 39–40), but Professor Franklyn admitted he "didn't use marketing principles" at all, (Doc. 85-62 at 240:22–241:10), did not review the marketing literature Professor Golder cited—calling it "mumbo jumbo"—and did not conduct empirical consumer research, (*id.* at 215:22–216:12). He testified that he "knows there is literature that challenges the concept of product categories" but could recall none, explaining that he considered it to be "general knowledge." (*Id.* at 219:10–14). These admissions confirm that his opinions are not the product of any reliable methodology. *See McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002).

Professor Franklyn's WeChat comparison suffers from similar defects. Asked what principles guided his comparison of Defendant to WeChat, Professor Franklyn responded that he simply "used th[e] principle of looking at competitors," which he described as "marketing 101." (Doc. 85-62 at 259:24–260:17). Professor Franklyn's report does not cite any empirical data, consumer research, or marketing framework to support his opinion. (*Id.* at 39). Similarly, Professor Franklyn's opinion that negative publicity about Defendant would diminish Plaintiff's advertising effectiveness is speculative and does not contain any methodology for measuring reputational effects on advertising. His "alternate scenario" of reverse confusion also fails to articulate any testable

framework and must also be excluded. *See McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004) ("[A]n expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions . . . .").

Moreover, several of Professor Franklyn's opinions fail for lack of factual foundation. Professor Franklyn asserted that WeChat offers services similar to Plaintiff, but the example he cited—"Tencent Marketing Solution"—is an advertising service provided by WeChat's parent company, not WeChat itself. (Doc. 85-73 at 40). Professor Franklyn also suggested that Defendant's use of the "X" mark would cause "secondary consumers" to confuse Plaintiff with Defendant, but he conceded that these "secondary consumers" would not be seeking Plaintiff's advertising services to begin with. (Doc. 85-62 at 267:19–22). The entirety of Professor Franklyn's critiques of Professor Golder must be excluded.

### 3. *Defendant's* Daubert *Challenge to Professor Franklyn's Critiques of Mr. Poret*

Professor Franklyn contends that Mr. Poret's survey universe was "underinclusive" because it "fails to account for consumers who will encounter [Plaintiff's] marks in the form of the advertisements that [Plaintiff] produces on behalf of [its] direct clients." (Doc. 85-73 at 11, 25-26). Defendant argues that Professor Franklyn's "underinclusive universe" opinion is unsupported by

22

reliable methodology, rests on faulty factual assumptions, and is inconsistent with prevailing legal authority. (Doc. 88 at 6–11).

The Court finds that Professor Franklyn's view that a reverse-confusion survey must include individuals beyond the senior user's actual customer base is methodologically unsound. The Eleventh Circuit has made clear that the relevant universe in a reverse-confusion case consists of the senior user's customers. *Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 137–38 (11th Cir. 2022); *see also Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 533 F. Supp. 75, 84 (S.D. Fla. 1981) (noting that the appropriate survey universe must include "those purchasers likely to partake of" the goods or services at issue) (quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980)). Here, Plaintiff's customers are law firms purchasing Plaintiff's legal advertising services. (Doc. 114-1 at 80:15–19). Professor Franklyn identifies no authority that would justify expanding the survey universe to "secondary consumers" with no role in purchasing Plaintiff's services. His proposal is not grounded in any accepted survey methodology or principle recognized in the case law.

Professor Franklyn's critique that consumers might view advertisements containing Plaintiff's name and logo is also predicated on a factual assumption that is unsupported by the record—that members of the general public exposed to Plaintiff's clients' Facebook ads actually see Plaintiff's mark. He identifies no example of a consumer-facing advertisement containing Plaintiff's name or

23

logo.[10] Professor Franklyn cites the presence of Plaintiff's name on the bottom of its law-firm client's external landing page (Doc. 85-73 at 25), but the record shows that this placement is not in a prominent location and that it is unclear whether consumers ever notice it. (Doc. 85-62 at 61:24–63:18). Expert testimony based on speculative assumptions disconnected from the facts of the case does not satisfy *Daubert*'s reliability requirement. *Ferguson v. Bombardier Servs. Corp.*, 244 F. App'x 944, 949 (11th Cir. 2007).

## IV.    CONCLUSION

As set forth above, it is **ORDERED** that Plaintiff's *Daubert* motion (Doc. 82) is **DENIED** and Defendant's Corrected *Daubert* motion (Doc. 88) is **GRANTED**. The Court excludes (1) Professor Franklyn's critiques of Professor Golder (Doc. 85-73 at 28–42) and (2) his critique that Mr. Poret's survey universe was underinclusive (*id.* at 25–26). Defendant's initial *Daubert* motion (Doc. 84) is **DENIED as moot**. Defendant's requests for oral argument (Docs. 86 & 101) are **DENIED** to the extent the requests pertain to the parties' *Daubert* motions.

**DONE** and **ORDERED** in Orlando, Florida, on September 5, 2025.

JOHN ANTOON II
United States District Judge

---

[10] After the close of discovery, Plaintiff produced for the first time Facebook advertisements that it created for its clients containing Plaintiff's own name and logo, which the Court struck as untimely. (*See* Doc. 135). In any event, Plaintiff represented that Professor Franklyn "did not rely" on these ads in his report. (Doc. 116 at 10). The Court does not consider these ads in resolving the present motion.

Copies furnished to:
Counsel of Record